**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| TREESAP FARMS, LLC, *et al.,* | § | |
| | § | Case No. 25-90017 (ARP) |
| Debtors.[1] | § | |
| | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION**
**OF TREESAP FARMS, LLC AND ITS AFFILIATED DEBTORS**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Timothy A. ("Tad") Davidson II
Joseph P. Rovira
Catherine A. Rankin
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  713-220-4200
Email:  taddavidson@hunton.com
        josephrovira@hunton.com
        crankin@hunton.com

*Counsel for Debtors and Debtors in Possession*

Dated:  May 9, 2025
Houston, Texas

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: TreeSap Farms, LLC (5183); TSH Opco, LLC (4697); TSV Opco, LLC (5418); TSV Reco, LLC (4953); and TreeSap Florida, LLC (5331). The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is TreeSap Farms, LLC, 5151 Mitchelldale St., Suite B-2, Houston, TX 77292-5279.

THIS DISCLOSURE STATEMENT (THIS "<u>DISCLOSURE STATEMENT</u>") IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  THE DEBTORS HAVE SOUGHT ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," AND APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

## IMPORTANT NOTICES

### Plan Voting

The voting deadline to accept or reject the Plan is [4:00 p.m.] Central time (the "<u>Voting Deadline</u>"), on [June 27], 2025, unless extended by the Debtors.  The record date for determining which Holders of Claims may vote on the Plan is [May 27], 2025 (the "<u>Voting Record Date</u>").

For your vote to be counted, you must return your properly completed Ballot in accordance with the voting instructions on the Ballot so that it is <u>actually received</u> by the Debtors' balloting agent, Donlin, Recano & Company, LLC (the "<u>Balloting Agent</u>"), before the Voting Deadline.

Ballots may be returned to the Balloting Agent in the return envelope provided or otherwise via only one of the following methods:

Regular Mail:

Donlin, Recano & Company, LLC
Re: TreeSap Farms, LLC, et al.
P.O. Box 2053
New York, NY 10272-2042

Overnight Courier or Hand Delivery:

Donlin, Recano & Company, LLC
c/o Angeion Group
Re: TreeSap Farms, LLC, et al.
200 Vesey Street, 24th Floor
New York, NY 10281

> **Online submission through the Debtors' restructuring website at:** https://www.donlinrecano.com/tsf.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.
>
> **Additional details on voting are discussed herein and set forth on the Ballots delivered to Holders of Claims entitled to vote on the Plan.**

This is the disclosure statement (the "Disclosure Statement") of TreeSap Farms, LLC ("TreeSap"); TSH Opco, LLC; TSV Opco, LLC; TSV Reco, LLC; and TreeSap Florida, LLC (each, a "Debtor" and, collectively, the "Debtors" or the "Company") as debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

Pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), the Debtors are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Plan of Liquidation of TreeSap Farms, LLC and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* dated May 9, 2025 (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "Plan"). The Plan is attached hereto as **Exhibit A**. All exhibits to this Disclosure Statement are incorporated into, and are a part of, this Disclosure Statement as if set forth in full herein. Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan.

The Plan is a liquidating plan. Pursuant to a separate sale order the Debtors expect will be entered by the Bankruptcy Court on or around May 12, 2025 (as further discussed below), the Debtors intend to sell substantially all of their assets to the Purchaser (defined below). The Plan provides for the distribution of any proceeds from such sale and other cash and the appointment of a plan administrator to administer and liquidate the Debtors' remaining assets and make distributions pursuant to the terms of the Plan. The Plan further provides for the substantive consolidation of all of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions.

The Debtors believe that the Plan is in the best interests of their creditors and other stakeholders. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. Detailed voting instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan and a summary of these instructions is set forth in Article I.B of this Disclosure Statement and in the Disclosure Statement Order (as defined below). For your vote to be counted, your Ballot must be properly completed and returned to the Balloting Agent, in accordance with the voting instructions on your Ballot and *actually received* by the Balloting Agent, via regular mail, overnight courier, or hand delivery at the appropriate address, or via the Balloting Agent's electronic ballot site, by the Voting Deadline.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan, and they may not be relied on for any purpose other than to determine how to vote on the Plan. Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, or annexes attached hereto. Any such information or representation given or made may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE IX</u> HEREOF, THE PLAN ATTACHED AS <u>EXHIBIT A</u> HERETO AND THE PLAN SUPPLEMENT, AS WELL AS TO CONSULT THEIR OWN ADVISORS, BEFORE VOTING ON THE PLAN.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, the Debtors will file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' case website located at *https://www.donlinrecano.com/tsf* no later than seven (7) days before/in advance of the Confirmation Objection Deadline (as defined herein).

This Disclosure Statement contains, among other things, descriptions, and summaries of provisions of the Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan. The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement and there can be no assurance that they will be correct at any time after this date. The information contained in this Disclosure Statement, including information about the Debtors' history, businesses, operations, financial information, and liquidation analysis, is included for soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any other proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on Holders of Claims against, or Interests in, the Debtors. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors believe that the solicitation of votes on the Plan made in connection with this Disclosure Statement does not require registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and related state statutes.

The effectiveness of the Plan is subject to material conditions precedent. See <u>Article V.H</u> below and <u>Article IX.B</u> of the Plan. There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtors will be bound the by the terms of the Plan and the transactions contemplated thereby.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. Forward-looking statements can often be identified by the use of terminology such as "subject to," "believe," "anticipate," "plan," "expect," "intend," "estimate," "project," "may," "will," "should," "would," "could," "can," the negatives thereof, variations thereon and similar expressions, or by discussions of strategy. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Article IX of this Disclosure Statement. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact the Balloting Agent as follows:

**Telephone**:  (877) 322-4952 (U.S./Canada Toll Free) or +1 (212) 771-1128 (International)
**Email**:  tsfinfo@angeiongroup.com (with "TreeSap" in the subject line)
**Website**: https://www.donlinrecano.com/ tsf (using the "Contact Information" link on the left hand menu of the website landing page)

**Please note that the Balloting Agent <u>cannot</u> provide you with legal or financial advice.**

**You are strongly encouraged to review the terms of the Disclosure Statement and the Plan and to consult your legal and financial advisors regarding your rights.**

**TABLE OF CONTENTS**

Page

Article I. INTRODUCTION ........................................................................................................1

    A.       Material Terms of the Plan ...........................................................................2
    B.       Voting on the Plan .......................................................................................2
    C.       Confirmation Hearing ..................................................................................6
    D.       Advisors ......................................................................................................7

Article II. OVERVIEW OF THE DEBTORS' EXISTING OPERATIONS .................................7

    A.       The Debtors' Corporate Structure ...............................................................8
    B.       The Debtors' Business Operations................................................................8
    C.       The Debtors' Prepetition Capital Structure..................................................9

Article III. EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11
CASES ...................................................................................................................13

    A.       Challenges Facing the Debtors' Business and Prepetition Strategic Efforts .........13
    B.       The Company Pivoted to Urgent Liquidity Negotiations with the
Prepetition Lenders ...................................................................................14
    C.       Pivot to DIP Financing and Chapter 11 Process .........................................15

Article IV. OVERVIEW OF THE CHAPTER 11 CASES .........................................................16

    A.       Commencement of Chapter 11 Cases .........................................................16
    B.       First Day Motions .....................................................................................16
    C.       Procedural Motions ...................................................................................17
    D.       Retention Applications...............................................................................17
    E.       DIP Financing ...........................................................................................17
    F.       Bidding and Sale Procedures .....................................................................18
    G.       Appointment of Creditors' Committee .......................................................22
    H.       Schedules and Bar Dates............................................................................22
    I.       Exclusivity ................................................................................................23
    J.       Key Employee Retention Plan & Key Employee Incentive Plan ..........................23

Article V. SUMMARY OF THE PLAN....................................................................................23

    A.       Unclassified Claims ...................................................................................24
    B.       Classified Claims and Interests..................................................................25
    C.       Acceptance or Rejection of the Plan ...........................................................28
    D.       Treatment of Executory Contracts, Unexpired Leases and Insurance
Policies ....................................................................................................29
    E.       Distributions..............................................................................................30
    F.       Procedures for Resolving Disputed, Contingent, and Unliquidated Claims
or Interests................................................................................................31

G.     Conditions Precedent to Confirmation.................................................................32
H.     Conditions Precedent to the Effective Date .......................................................33
I.      Releases...............................................................................................................34

Article VI. MEANS FOR IMPLEMENTATION..............................................................37

A.     Transaction Effective as of the Effective Date ..................................................37
B.     General Settlement of Claims and Interests.......................................................38
C.     Intercreditor Agreement.....................................................................................38
D.     Administrative Consolidation for Voting and Distribution Purposes Only...........38
E.     Uses of Cash ......................................................................................................39
F.     Plan Administrator .............................................................................................39
G.     The Plan Administration Assets.........................................................................39
H.     Cancellation of Existing Securities and Agreements.........................................40
I.      Corporate Action................................................................................................40
J.      Exemption from Transfer Taxes and Fees .........................................................40
K.     Directors, Managers, and Officers of the Debtors .............................................41
L.     Insurance Policies ..............................................................................................41
M.    Cooperation Between Plan Administrator and Purchaser...................................41

Article VII. CONFIRMATION OF THE PLAN...............................................................42

A.     Confirmation Hearing ........................................................................................42
B.     Objections to Confirmation of the Plan .............................................................42
C.     Confirmation ......................................................................................................43
D.     Classification of Claims and Interests................................................................46
E.     Consummation ...................................................................................................46
F.     Dissolution of Committee ..................................................................................47
G.     Modification of Plan ..........................................................................................47
H.     Revocation or Withdrawal of the Plan ...............................................................47
I.      Post-Confirmation Jurisdiction of the Bankruptcy Court ...................................47

Article VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ....................................................................................................................49

A.     Continuation of Chapter 11 Cases .....................................................................50
B.     Liquidation under Chapter 7 ..............................................................................50
C.     Dismissal of Chapter 11 Cases ..........................................................................50

Article IX. FACTORS TO CONSIDER BEFORE VOTING ..........................................51

A.     Certain Bankruptcy Law Considerations ...........................................................51
B.     Additional Factors..............................................................................................54

Article X. CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES
OF THE PLAN ..............................................................................................................56

A.     Consequences to Debtors...................................................................................57

B.      Information Reporting and Backup Withholding ....................................................60

CONCLUSION AND RECOMMENDATION...............................................................................61

## EXHIBITS

EXHIBIT A:  Plan

EXHIBIT B:  Liquidation Analysis (to be filed)

# ARTICLE I.
## INTRODUCTION

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' pre-sale businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of Holders of Claims and Interests under the Plan, and (v) other matters necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan.  Only Holders of Claims in Classes 3 and 4 are entitled to vote on the Plan; Holders of Claims in other Classes and Holders of Interests are not entitled to vote on the Plan (*see* discussion at <u>Article V</u> of this Disclosure Statement).

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all Holders of Claims against the Debtors entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan.  This Disclosure Statement is also available to all Holders of Claims against and Interests in the Debtors not eligible to vote on the Plan for informational purposes, including to detail the impact the Plan will have on such Holders' Claims and Interests.

As reflected in the *Declaration of Jonathan A. Saperstein in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 14] (the "<u>First Day Declaration</u>"), the Debtors launched the Chapter 11 Cases to pursue a competitive sale process for their assets.  As further discussed in Article IV.F[2] below, the sale process resulted in the sale of substantially all of the Debtors' assets (the "<u>Sale Transaction</u>") pursuant to that certain Stalking Horse APA by and between the Stalking Horse Bidder TYFCO, LLC, as purchaser, and the Debtors, as sellers.  TYFCO is an entity formed by Mr. Jonathan Saperstein, the Debtors' Chief Executive Officer and majority common equity interest owner, for purposes of consummating the Sale Transaction.  More details regarding the sale process and the material terms of the Sale Transaction can be found in Article IV.F of this Disclosure Statement.  The Debtors anticipate on the Sale Transaction being approved by the Bankruptcy Court on or around May 12, 2025.

The Plan includes certain release, injunctive, and exculpatory provisions detailed in <u>Section V.I</u> below.

This Disclosure Statement sets forth certain information about the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, and material events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation and effectiveness of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

---

[2]   Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in Article IV.F of this Disclosure Statement.

### A.   Material Terms of the Plan

The Debtors expect the Bankruptcy Court will enter an order (the "Sale Order") Docket No. [___] on or around May 12, 2025, approving the Sale Transaction.   The closing of the Sale Transaction is a condition precedent to the Plan becoming effective.   The Debtors intend to consummate the Sale Transaction as promptly as practicable and before the consummation of the Plan.   While Article V of this Disclosure Statement contains a more detailed summary of the terms of the Plan, a brief overview is provided below:

(a)   The Debtors' Plan is a liquidating plan which assumes closing of the Sale Transaction will occur.

(b)   The Plan provides for the distribution of proceeds received from the Sale Transaction, as well as the distribution of other cash of the Debtors', to Holders of Allowed Claims and Interests against the Debtors, in accordance with the terms of the Plan, including:

  i.   cash sufficient to satisfy Administrative Claims, Other Secured Claims, Other Priority Claims, Professional Fee Claims, Priority Tax Claims;

  ii.   cash that will be earmarked for the GUC Recovery Pool; and

  iii.   cash sufficient to cover the Wind Down; and

(c)   Assumed Trade Payable Claims—which are any prepetition or postpetition Claim through the sale's Closing Date that are held by a claimant that provided goods and services related to the operation of the Debtors' business—will be assumed by the Stalking Horse Bidder pursuant to the terms of the Stalking Horse APA, except as otherwise provided in the Plan.

The individual or entity designated in the Plan Supplement will serve as Plan Administrator and will, among other things, facilitate Distributions under the Plan until the Chapter 11 Cases of all the Debtors have been fully administered, wind up the Debtors' estates, and administer and liquidate certain property of the Debtors, including the Retained Causes of Action.

After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and Plan Administration Expenses, and to the extent that the Plan Administrator determines in good faith and on a reasonable basis, that substantially all of the Claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied in full, the Plan Administrator will remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to a non-profit charitable organization qualifying under Section 501(c)(3) of the I.R.C., as selected by the Plan Administrator in its sole discretion.

### B.   Voting on the Plan

The Debtors' proposed Disclosure Statement Order provides for certain procedures governing the solicitation of votes on the Plan from Holders of Claims against the Debtors, including setting the Voting Deadline, determining which Holders of Claims are eligible to vote on the Plan, and setting other voting procedures.

THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.  YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE COMBINED HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

The Plan is based on the substantive consolidation of the Debtors solely for voting, determining which class or classes have accepted the Plan, confirming the Plan, and the resulting treatment of Claims and Interests and Distributions under the Plan.

Except as otherwise expressly provided in the Plan, each Debtor will continue to maintain its separate corporate existence for all purposes other than the treatment of Claims under the Plan. On or before the Effective Date, each of the Debtors will assign and transfer any and all of their respective remaining assets, including the Retained Causes of Action, to Post-Effective Date TreeSap. As a result, each Claim filed against one Debtor will be deemed filed against Post-Effective Date TreeSap for Plan purposes.  The Debtors' substantive consolidation solely for Plan purposes will not affect the legal and corporate structure of the Debtors, and will not constitute a transfer of assets or liabilities between the Debtors for any tax purposes.

### 1. Parties Entitled to Vote on the Plan

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes may vote on the Plan (unless, for reasons discussed below, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes which Classes are Impaired and which are entitled to vote on the Plan.  The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3. | Prepetition Lenders Secured Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Impaired | Entitled to Vote |
| 5. | Intercompany Claims | Impaired | Deemed to Reject |
| 6. | Intercompany Interests | Impaired | Deemed to Reject |
| 7. | Equity Interests | Impaired | Deemed to Reject |

Accordingly, only Holders of record of Claims in Classes 3 and 4 as of [May 27], 2025, the Voting Record Date established by the Debtors for the solicitation of votes on the Plan, are

entitled to vote on the Plan.  If your Claim is not in one of these two Classes, you cannot vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If your Claim is in one of these two Classes, you should read your Ballot and follow the voting instructions carefully.  In addition, the Disclosure Statement Order sets forth certain assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.  Please review the Disclosure Statement Order in its entirety before submitting your Ballot and submit only the Ballot that accompanies this Disclosure Statement.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not cast, solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a chapter 11 plan, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  In addition, with respect to Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class that cast ballots for acceptance or rejection of a plan.  Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the holders of claims voting cast their ballots to accept the plan.

### 2.    Parties Not Entitled to Vote on the Plan

Holders of Claims and Interests in Classes 1, 2, 5, 6, and 7 are not entitled to vote to accept or reject the Plan (collectively, the "Non-Voting Classes").  Instead of receiving the Solicitation Package (as defined below), Holders of Claims in the Non-Voting Classes, pursuant to paragraphs [14] and [15] of the Disclosure Statement Order, will receive the Notice of Non-Voting Status (as defined in the Disclosure Statement Order).  Because Intercompany Claims in Class 5 and Intercompany Interests in Class 6 are held by the Debtors, such Holders will not receive a Solicitation Package or a Notice of Non-Voting Status.

### 3.    Solicitation Package

The solicitation materials sent to Holders of Claims entitled to vote on the Plan contains (collectively, the "Solicitation Package"):

- a copy of the notice of hearing regarding final approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing Notice");

4

- a copy of this Disclosure Statement together with the exhibits hereto, including the Plan;

- a copy of the Disclosure Statement Order in its entered form (without exhibits attached);

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan; and

- an appropriate form of Ballot, instructions on how to complete the Ballot, and a prepaid, pre-addressed Ballot return envelope.

In addition, the Plan, this Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Debtors' Balloting Agent at https://donlinrecano.com/Clients/tsf/Index. The Debtors will also provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Balloting Agent by email at tsfinfo@angeiongroup.com (with "TreeSap Solicitation Inquiry" in the subject line) or by telephone at (877) 322-4952 (U.S./Canada, toll free) or (212) 771-1128 (for international callers).

### 4. Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot or Ballot(s) has been enclosed in your Solicitation Package for voting on the Plan. Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

Prior to voting on the Plan, you should carefully review (1) the Plan and the Plan Supplement, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Combined Hearing Notice, and (5) the detailed instructions accompanying your Ballot(s).

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. If you (1) hold Claims in more than one voting Class, or (2) hold multiple Claims within one Class, you may receive more than one Ballot.

All Ballots, to be counted, must be properly completed in accordance with the voting instructions on the Ballot, and **actually received** by the Balloting Agent no later than the Voting Deadline (i.e., **[June 27], 2025, at [4:00] p.m. (Central Time)**) by the Balloting Agent by one of the following means:

Regular Mail:

Donlin, Recano & Company, LLC
Re: TreeSap Farms, LLC, et. al
P.O. Box 2053
New York, NY 10272-2042

Overnight Courier or Hand Delivery:

Donlin, Recano & Company, LLC
c/o Angeion Group
Re: TreeSap Farms, LLC, et. al
200 Vesey Street, 24th Floor
New York, NY 10281

Online Submission: https://www.donlinrecano.com/tsf.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Detailed instructions for completing and transmitting Ballots are included with the Ballots, provided in the Solicitation Package.

If the Balloting Agent receives more than one timely, properly completed Ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for determining whether sufficient acceptances to confirm the Plan have been received will be the vote recorded on the last timely, properly completed Ballot, as determined by the Balloting Agent, received with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan, the Ballot, or the procedures for voting on the Plan, please contact the Balloting Agent (at the phone numbers or email address listed above).

Before voting on the Plan, each Holder of a Claim in Classes 3 and 4 should read, in its entirety, this Disclosure Statement, the Plan and the Plan Supplement, the Disclosure Statement Order, the Combined Hearing Notice, and the instructions accompanying the Ballot.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own legal, tax and/or financial advisors.

### C.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The hearing for the Bankruptcy Court to consider final approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") has been scheduled for **[July 8], 2025, at [9:00 a.m.] (Central Time)**, before the Honorable Judge Alfredo R. Perez, United States Bankruptcy Judge for the Southern District of Texas, in Courtroom 400 of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002, (or via telephonic or other electronic means, as the Bankruptcy Court may direct).[3] The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court without further notice except as may be stated in open Court or filed on the docket.  Any objection to final approval of the Disclosure Statement or Plan confirmation must (a) be in writing,

---

[3]    To the extent the Confirmation Hearing occurs virtually, participation instructions will be provided on the agenda filed on the docket prior to the Confirmation Hearing.

(b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any claim or interest asserted by the objector against or in the Debtors, and (d) state with particularity the legal and factual bases for the objection. Any such objections must be filed and served upon the persons designated in the Combined Hearing Notice in the manner and by the deadline described therein.

### D. Advisors

The Debtors' bankruptcy legal advisor is Hunton Andrews Kurth LLP, their financial advisor is The Keystone Group ("Keystone"), and their investment banker is Armory Securities, LLC ("Armory"). The Debtors' advisors can be contacted at:

| | |
|---|---|
| Hunton Andrews Kurth LLP (Debtors' Restructuring Counsel) | Hunton Andrews Kurth LLP 600 Travis Street, Suite 4200 Houston, TX 77002 Attn: Timothy A. ("Tad") Davidson II, Joseph P. Rovira, and Catherin A. Rankin |
| McKool Smith, P.C. (Debtors' Co-Counsel) | McKool Smith, P.C. 600 Travis Street, Suite 7000 Houston, TX 77002 Attn: John J. Sparacino, S. Margie Venus, and Adam D. Skrzecz |
| The Keystone Group (Debtors' Financial Advisor) | Keystone Group 311 South Wacker Drive Chicago, IL 60606 Attn: Bret C. Jacobs, Paige Burkard |
| Armory Securities, LLC (Debtors' Investment Bank) | Armory Securities, LLC 330 Madison Avenue 200 N. Pacific Coast Hwy, Suite 1525 El Segundo, CA 90245 Attn: Douglas McDonald, Eben Perison, Ron Papile |
| Donlin, Recano & Company, LLC (Debtors' Claims, Noticing, and Solicitation Agent) | Donlin, Recano & Company, LLC 55 East P.O. Box 2053 New York, NY 10272-2042 Attn: Andrew Logan |

### ARTICLE II.
### OVERVIEW OF THE DEBTORS' EXISTING OPERATIONS

The following is an overview of the Debtors' historic operations, capital structure, and certain other matters. As noted above, upon closing of the Sale Transaction and in accordance with the terms of the APA, substantially all of the Debtors' assets and operations will be transferred

to the Purchaser, and the remainder of the Debtors' estates will be wound down and administered in accordance with the Plan.

### A.    The Debtors' Corporate Structure

TreeSap Farms, LLC holds 100% of the equity in the other Debtor entities. Essentially, all operations are conducted at the TreeSap level, and TreeSap is the employer for all of the Employees. As a result, substantially all of the Debtors' unsecured creditors hold claims against TreeSap Farms, LLC. TreeSap Farms is the borrower under all of the Debtors' Prepetition Facilities, which are guaranteed by each of the other Debtors.

A detailed organizational chart is set forth below:



### B.    The Debtors' Business Operations

### 1.    The Debtors' Operations

As of the Petition Date, TreeSap was one of the foremost horticultural producers in the United States, growing a diverse range of shade trees, shrubs and ornamental plants. Headquartered in Houston, Texas, the Debtors operated an extensive network of 15 farms strategically located to serve the U.S. coast-to-coast from three operating divisions: Northwest, Southwest, and Southeast U.S. These operations cover an expansive footprint, with over 6,700 acres dedicated to production, where the Debtors grow in excess of 33 million plants annually. The Company sold its products to a broad spectrum of clientele, including retail customers, landscape contractors and landscape architects. The Company also maintains a West Coast office in Orange, California.

The Company began in 2001 as TreeTown USA with the opening of its first farm in Glen Flora, Texas. In 2015, I was part of a management/ownership group that acquired TreeTown USA from previous ownership.  For nearly six years, the Company consummated a number of strategic acquisitions to expand the Company's footprint nationwide, including substantial acquisitions of Village Nurseries (in 2017) and Hines Growers (in 2018) in California. As of the Petition Date, the Company was one of the largest growers of outdoor nursery plants in the U.S., with three operating divisions and 15 farms in four states – nine in California, two in Texas, three in Florida and one in Oregon – and ships plants throughout the country. The Company owned seven of its farm locations and leased eight of its locations.

### 2.  The Debtors' Customers

As described further in the First Day Declaration and as of the Petition Date, the Company enjoyed a diversified retail and wholesale (including landscape contractors) customer mix that was built over its 24-year history. The retail/wholesale mix was historically split on a nearly even 50/50 revenue basis. The Debtors' retail customers included many of the largest home improvement and general merchandise retailers in the country, while their wholesale customers included a wide array of many of the most prominent regional landscape firms in the regions served by the Debtors.

### 3.  The Debtors' Employees

The Company employed approximately 1,400 full-time employees (the "Employees") as of the Petition Date, consisting of approximately 1,280 hourly employees and 164 salaried employees. The Company's business operations were highly seasonal and, depending upon seasonal needs, the Company also relied upon contract and/or temporary employees to support its operations. Many of these people were provided to the Company by outside staffing services.

### C.  The Debtors' Prepetition Capital Structure

### 1.  Overview of the Debtors' Funded Debt

As further described below, as of the Petition Date, the Debtors maintained outstanding funded and, in the case of HCR Moorpark, unfunded debt obligations in the amount of approximately $207 million, which is summarized in the following table:

| Governing Document | Facility/Note | Borrower | Approximate Balance Outstanding w/o Interest or Fees |
|---|---|---|---|
| Capital Farm Credit ("CFC") Credit Agreement | CFC Operating Note | TreeSap (the other Debtors are Guarantors) | $155,199,518 |
| | CFC Real Estate Term Note | | $19,358,818 |
| | CFC Equipment Term Note | | $176,470 |
| | CFC LaVerne Acquisition Term Note | | $1,925,000 |

| | CFC Term RLOC Note | | $10,000,000 |
| | Travelers Standby LOC Backup Note | | $0.00 |
| | Hartford Fire Standby LOC Backup Note | | $0.00 |
| Farm Credit Leasing -- Master Lease and Schedules | Capital Leases | TreeSap (other Debtors are guarantors) | $1,966,497 (aggregate) |
| Onset Financial -- Capital Leases | Capital Leases | TreeSap | $2,125,307 (aggregate) |
| Regents Capital -- Capital Lease | Capital Lease | TreeSap | $123,349 |
| AvTech Capital -- Capital Leases | Capital Leases | TreeSap | $1,922,035 (aggregate) |
| HCR Moorpark | HCR Agreements | TSV Reco, TSV Opco, and TreeSap | $12,638,333 |
| **Total Prepetition Secured Debt** | | | $205,435,327 |

## 2.    Prepetition Credit Facility

Effective as of July 30, 2021, TreeSap (as borrower) entered into that certain Amended and Restated Loan Agreement (as amended, supplemented, restated, replaced or otherwise modified from time to time, the "Prepetition Loan Agreement") by and among TreeSap, as the borrower, TSV Opco, LLC ("TSV Opco"), TSV Reco, LLC ("TSV Reco"), TreeSap Florida, LLC, ("TreeSap Florida"), TSH Opco, LLC ("TSH Opco" and together with TSV Opco, TSV Reco, and TreeSap Florida, collectively, the "Debtor Guarantors"), and Jonathan A. Saperstein ("Mr. Saperstein"), the Chief Executive Officer of TreeSap, individually (the "Individual Guarantor"), as guarantors and grantors thereunder (the Debtor Guarantors and the Individual Guarantor are collectively, the "Prepetition Guarantors"), and Capital Farm Credit, ACA, for itself and/or as agent/nominee (the "Prepetition Agent") for any party pursuant to a Master Agreement among it and its wholly-owned subsidiaries, Capital Farm Credit, FLCA and Capital Farm Credit, PCA and/or any additional "Participants" as provided by the Prepetition Loan Agreement (each, a "Prepetition Lender" and collectively, the "Prepetition Lenders"), pursuant to which the Prepetition Lenders have advanced and provided certain loans and financial accommodations to the Debtors (collectively, the "Prepetition Facilities").

As of the Petition Date, the following promissory notes remained issued and outstanding under Prepetition Loan Agreement:

> (a)    A promissory note in the principal amount of $155,200,000.00 (the "Operating Note") with an outstanding principal balance due as of the Petition Date of $155,199,518.18;

> (b)    A promissory note in the principal amount of $29,974,945.70 (the "Real Estate Term Note") with an outstanding principal balance due as

of the Petition Date of $19,358,818.85;

(c)      A promissory note in the principal amount of $5,000,000.00 (the "Equipment Term Note") with an outstanding principal balance due as of the Petition Date of $176,470.54;

(d)      A promissory note in the principal amount of $3,500,000.00 (the "La Verne Acquisition Note") with an outstanding principal balance due as of the Petition Date of $1,925,000.09;

(e)      A promissory note in the principal amount of $10,000,000.00 (the "Term RLOC Note") with an outstanding principal balance due as of the Petition Date of $10,000,000.00;

(f)      A promissory note in the principal amount of $950,000.00 with an outstanding principal balance due as of the Petition Date of $0.00 (the "Travelers LOC Backup Note"); and

(g)      A promissory note in the principal amount of $800,000.00 with an outstanding principal balance due as of the Petition Date of $0.00 (the "Hartford LOC Backup Note", and collectively with the above, the "Prepetition Notes").

The aggregate principal amount outstanding under the Prepetition Facilities, which is evidenced by the Prepetition Notes, as of the Petition Date was approximately $188,168,247.00.

Pursuant to various security agreements, mortgages, deeds of trust, and UCC and financing statement filings, the obligations owing under the Prepetition Facilities are secured by validly-existing and duly-perfected first-priority liens and security interests in and upon substantially all of the real and personal property assets of TreeSap and the Debtor Guarantors.

### 3.      Intercreditor Agreement

HCR Moorpark Investors LLC ("HCR Moorpark") asserts a subordinated debt claim against Debtors TSV Reco and TSV Opco arising out of a certain (i) Forbearance Agreement and Release dated February 28, 2017 (the "HCR Forbearance Agreement"), and (ii) Assumption Agreement dated September 29, 2017 (the "HCR Assumption Agreement", and together with the HCR Forbearance Agreement, the "HCR Agreements"). The HCR Agreements purport to obligate TSV Reco and TSV Opco to pay HCR Moorpark the original principal sum of $18,875,000 on account of a judgment in favor of HCR Moorpark against Village Nurseries, TSV Reco's predecessor in title to the Debtors' Southwest Division owned real property (the "TSV Reco Real Property"). Specifically, in September 2017, TSV Reco purchased the TSV Reco Real Property from Village Nurseries subject to HCR Moorpark's judgment lien against the property. At the time of TSV Reco's acquisition of the TSV Reco Real Property, the property was subject to a judgment lien in favor of HCR Moorpark due to that certain Abstract of Judgment that was recorded in the real property records of: (i) Riverside County, California, (ii) Orange County, California, and (iii) San Diego County, California (such counties identified in (i)-(iii), collectively, the "California Counties").

HCR Moorpark asserts liens and security interests against the TSV Reco Real Property to secure the alleged obligations of TSV Reco and TSV Opco under the HCR Agreements pursuant to certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing documents that have been filed of record in the Official Records of the California Counties.

Pursuant to that certain Intercreditor and Subordination Agreement dated September 29, 2017 (the "Intercreditor Agreement"), between the Prepetition Lenders and HCR Moorpark, HCR Moorpark has expressly subordinated any liens it may hold on "Common Collateral" (as defined in the Intercreditor Agreement) to any liens in favor of the Prepetition Lenders. Moreover, pursuant to Section 4.1(a) of the Intercreditor Agreement, all proceeds resulting from the sale of the Common Collateral shall be distributed first to the Prepetition Lenders on behalf of the Debtors' obligations owed to the Prepetition Lenders until *all* such obligations have been repaid in full, and second to HCR on behalf of the Debtors' obligations owed to HCR on account of the Debtors' obligations owed to HCR until all such obligations have been repaid in full. Section 4.1 of the Intercreditor Agreement also provides that any proceeds of Common Collateral that may be received by HCR shall be promptly paid over to the Prepetition Lenders. Accordingly, given the amount of the Prepetition Lenders' claim and the Intercreditor Agreement, it is highly unlikely that HCR's claim will be repaid in full, let alone at all.

### 4.    Capital Leases

As of the Petition Date, the Debtors were parties to numerous capital lease and equipment financing agreements with Farm Credit Leasing Services Corporation ("FCL"), Onset Financial, Inc. ("OFI"), Regents Capital Corporation ("Regents"), and AvTech Capital, LLC ("AvTech" and the capital lease and equipment financing agreements between certain of the Debtors and FCL, OFI, Regents and AvTech, collectively, the "Capital Leases"). Pursuant to the Capital Leases, the Debtors financed their acquisition and/or use of specific equipment and facilities. As of the Petition Date, the aggregate amount outstanding under the Capital Leases was approximately $5,860,000, and the Debtors monthly payment obligations under the Capital Leases totaled approximately $241,000.

### 5.    General Unsecured Debt

In the ordinary course, the Debtors incurred trade debt with certain vendors and suppliers in connection with the operation of their business. As of the Petition Date, the Debtors owed approximately $24.0 million in trade debt to their vendors and service providers. In addition, the Debtors are exposed to contingent liabilities in the nature of future earn-out obligations associated with the LaVerne Nursery acquisition in June 2022 and a certain business combination that occurred in 2015.

### 6.    Equity Interests

As of the Petition Date, the common equity in TreeSap was owned by the Debtors' chief executive officer, Mr. Saperstein, two trusts and a limited liability company controlled or existing for the benefit of Mr. Saperstein and his immediate family members, as reflected in the corporate chart found in Article II.A of this Disclosure Statement. TreeSap issued 100% of its preferred equity units to TreeTown/ARM Fund LLC as of the Petition Date.

## ARTICLE III.
## EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

### A.      Challenges Facing the Debtors' Business and Prepetition Strategic Efforts

For the last several years, the Debtors faced several operational and financial challenges that ultimately led to the filing of the Chapter 11 Cases. These challenges included substantial losses in their Southern California operations (including weather-driven losses) that more than negated the Debtors' profitable operations in all other regions, liquidity challenges that were exacerbated by the Debtors' highly seasonal business operations and cash flows, increasing debt burdens, and maturities under the Prepetition Facilities. Despite numerous initiatives that resulted in substantially improved profitability and positive trends (including a phenomenal turnaround in Southern California profitability), the Debtors were not afforded the runway and support needed to reduce their debt burdens and obligations, and address debt maturities.

The Debtors operated in multiple different geographies and climates as of the Petition Date. In 2022, the Southern California region experienced drought conditions followed by higher than average wet weather days in 2023 and 2024, resulting in reduced sales in those years. The Company took actions such as reducing production and headcount to offset these factors; however, the timeframe required to realize the benefits of these actions in the Debtors' industry is relatively long due to growing cycles. Additionally, from 2022-2024, the Company's debt load increased by $22.5 million as working capital increased, operations generated lower than forecasted profits, and interest expense more than doubled, which lead to $25.3 million in additional interest expenses during that period. The Company successfully reduced annual expenses by $30.1 million from 2021 to 2024, including an approximate 240-person headcount reduction. Throughout this period, the Company's operations in all of its regions other than Southern California remained consistently profitable.

Over one year ago, the Debtors and the Prepetition Lenders initiated discussions regarding looming maturities under the Prepetition Facilities. Various accommodations and potential paths were discussed on a preliminary basis. Additionally, the parties agreed to various maturity date extensions during 2023 and 2024. At around this same time, the Debtors began to develop long-range operational changes and initiatives that, as noted above and below, contributed to the filing of the Chapter 11 Cases.

As discussions with the Prepetition Lenders continued in Spring 2024, various financing and re-financing alternatives were discussed, including several that were raised and suggested by the Prepetition Lenders. In July 2024, the Debtors engaged Armory as their investment banking firm with a mandate to pursue various financing and re-financing alternatives, including several alternatives suggested or favored by the Prepetition Lenders. The Company, with the assistance of Armory, explored, pursued and/or presented various options to the Prepetition Lenders, including sale-leaseback concepts, subordinated debt financing, and various equipment financing structures.

Armory's and the Company's efforts were two-fold. First, Armory initiated outreach to potential third-party financing sources seeking proposals to refinance the Company's existing capital structure and provide the Company with additional working capital. Second, during this time, the Company and Armory began actively engaging in discussions and negotiations with the Prepetition Lenders to address capital needs, looming maturities and covenant concerns. Unfortunately, the third party efforts did not result in any consummated transactions for various

reasons, but most prominently because each proposal would have required an extended runway (*i.e.*, extensions of the impending maturities under the Prepetition Facilities, without which extension the counterparties who provided such proposals were unwilling to inject capital into the Company's business and/or to consummate alternative transaction) from the Prepetition Lenders which they were unwilling to do.

As noted above, during this same time period starting in August 2024, the Debtors analyzed and implemented a number of comprehensive and wide-ranging operational initiatives. One initiative focused upon a turnaround of the Southwest division operations. The Company targeted a $5 million increase in division revenues resulting from normalized weather and traffic patterns with a substantial retail customer. The Company also reduced Southwest division employee expenses by way of an employee reduction in force in Q4 2024. The Company assessed and initiated steps toward pursuing the exit of facilities and operations at Fallbrook, with a resulting consolidation of certain Southwest operations. The Company projected that these initiatives alone would have brought substantial net proceeds, expense reductions, and EBITDA increases.

In addition to implementing these changes, the Company also put in place a number of initiatives aimed at rationalizing certain operational issues, including SKU rationalization with several "big box" or mass merchant customers to streamline SKUs and reduce operating costs; increasing inventory turns by producing fewer units and eliminating slow moving inventory to reduce production costs; initiating price promotions with the Company's largest customer to deal with slower turning inventory; and selling excess inventory across divisions.

**B.    The Company Pivoted to Urgent Liquidity Negotiations with the Prepetition Lenders**

Despite sourcing multiple potentially actionable alternatives that may have brought much needed new capital and/or reduced the Prepetition Debt, the Prepetition Lenders were unwilling to provide the Company with releases for pari-passu or senior liens on its collateral or the extended runway (*i.e.*, extensions of the impending maturities under the Prepetition Facilities, without which extension the counterparties who provided such proposals were unwilling to inject capital into the Company's business and/or to consummate alternative transactions) necessary to pursue consummation of such proposals. This caused the Company, in late 2024, to shift focus to obtaining new capital and extended maturities from the Prepetition Lenders. The Company's inability to obtain the extended runway necessary to pursue third-party proposals it had sourced resulted in the Company shifting its focus from such third-party proposals to seeking modifications and/or accommodations, *e.g.*, obtaining additional funding under and extensions of the maturity of the Prepetition Facilities, from the Prepetition Lenders under the Prepetition Facilities. During this time, the Company, with the aid of Armory, also began actively engaging in discussions and negotiations with the Prepetition Agent and the Prepetition Lenders to address these needs.

The seasonality of the Company's business operations and resulting cash flows placed the Company in a critical situation in late 2024. Historically, the Company's peak selling season began in mid-March and extended through June. Typically, the Company began to ramp up production expenses in January and continued into March. Yet, January was typically the lowest sales month for the Company. To reflect this contrast, historically sales in March through May reached as high as $27 million per month, while sales in December and January could be well-below $10 million per month. Historically, as sales picked up into March, the Company would see an increase in cash

and receivables that ultimately began to drive the periods of highest cash receipts through June each year.

Through extensive, arm's-length and, at times difficult negotiations, the Company and the Prepetition Lenders reached agreement on December 31, 2024, pursuant to which the Prepetition Lenders agreed to provide an additional $3 million in funding (such funding coming in the form of a protective advance) to support the Company's immediate cash needs. That same agreement required the Company to engage a chief restructuring officer (a "CRO"). The Company interviewed several candidates and, ultimately, engaged Bret Jacobs as the Company's CRO (the "CRO"), and his firm The Keystone Group ("Keystone") to serve as a financial advisor to the Company.

The CRO and his team at Keystone immediately began to, *inter alia*, (i) assess the Company's situation, (ii) prepare forecasts and models, and (iii) engage with the Prepetition Lenders to determine a path forward to maximize recoveries for creditors under the circumstances. During this time, the Debtors and their advisors communicated on multiple occasions the Debtors' firm belief that the Prepetition Lenders' recoveries would be maximized outside of a chapter 11 process, so long as the Prepetition Lenders agreed to provide incremental funding to allow the Debtors to reach their high cash flow season beginning in March. Ultimately, however, the Prepetition Lenders declined to provide any additional liquidity under the Prepetition Facilities or otherwise, and instead the Prepetition Lenders have only offered additional funding as part of court-approved postpetition financing package that would include sale and/or liquidation milestones.

### C.      Pivot to DIP Financing and Chapter 11 Process

The Company and the lenders began negotiations as to the size, form and terms (including milestones) of postpetition financing. At the time of this pivot to postpetition financing, the Company's projections reflected that the Company would imminently run out of cash without incremental funding. The Company's liquidity situation was critical, and thus the Company lacked the ability or time to meaningfully pursue alternative capital sources or alternatives. Armory and the Company's other advisors believed that the overall terms of the DIP Facility are reasonable and customary market terms for similar types of facilities, and that under the circumstances, including the Company's lack of unencumbered assets, no better alternative options would have been sourced, even with additional time for such sourcing.

Even in the midst of postpetition financing negotiations, the Company continued to urge for additional time to pursue strategic alternatives that, in the Company's view, would substantially enhance stakeholders' recoveries. During this process, difficult negotiations with the Prepetition Lenders resulted in an agreement, on January 28, 2025, by which the Prepetition Lenders agreed to provide an additional $3.2 million in critically-needed funding to meet the Company's immediate cash needs. This agreement included a requirement that the Company commence chapter 11 cases by February 3, 2025. During this same time, Armory received several third party transaction and refinancing expressions of interest. The Company and its advisors firmly believed that these expressions presented meaningful and beneficial alternatives to an immediate chapter 11 filing and that an immediate filing would negatively impact the potential alternatives. The Company shared this information and these views with the Prepetition Lenders, resulting in subsequent agreements by the Prepetition Lenders to (i) extend the February 3rd filing deadline, and (ii) continue to offer to provide postpetition financing consistent with the parties' negotiations.

The Prepetition Lenders ultimately refused a further filing extension in part due to the Company's additional liquidity needs during the week of February 24, 2025. As a result, the Debtors commenced these Chapter 11 Cases.

**ARTICLE IV.**
**OVERVIEW OF THE CHAPTER 11 CASES**

**A.     Commencement of Chapter 11 Cases**

On February 24, 2025, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**B.     First Day Motions**

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course (the "First Day Motions"). The relief sought in the First Day Motions was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth going-concern sale through the chapter 11 process, and minimizing disruptions to the Debtors' businesses. The Bankruptcy Court entered various orders authorizing the relief requested in the First Day Motions, including, among other things, authorizing the Debtors to:

- Jointly administer the Chapter 11 Cases [Docket No. 21];

- Retain Donlin, Recano & Company, LLC as claims, noticing, and solicitation agent [Docket No. 22];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 36];

- File a consolidated list of creditors and modify certain notice and identification requirements [Docket No. 33];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 39];

- Pay certain prepetition taxes and fees [Docket No. 38];

- Continue insurance policies and insurance programs [Docket No. 35];

- Continue paying prepetition workforce obligations and certain related claims [Docket No. 37];

- Continue to use cash collateral and obtain postpetition financing (as further described below) [Docket No. 32];

- Pay certain obligations related to critical vendors [Docket No. 41]; and

- Maintain and administer existing customer programs and honor certain prepetition obligations related thereto [Docket No. 42].

### C.      Procedural Motions

Since the commencement of these Chapter 11 Cases, the Debtors have also filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity including, without limitation, a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals [Docket No. 93], a motion for entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business [Docket No. 190], a motion extending the period time of time to file the Schedules and Statements [Docket No. 6], and a motion for entry of an order establishing bar dates for the filing of Proofs of Claim related to certain prepetition Claims [Docket No. 94].

### D.      Retention Applications

The Debtors have filed various applications regarding the retention of professionals during these Chapter 11 Cases, as is common in chapter 11 cases of similar size and complexity, including, without limitation:

- An application for entry of an order authorizing the retention of Hunton Andrews Kurth LLP as bankruptcy counsel [Docket No. 89], which the Bankruptcy Court approved on April 8, 2025 [Docket No. 180];

- An application for entry of an order authorizing the retention of McKool Smith, P.C. as co-counsel [Docket No. 92], which the Bankruptcy Court approved on April 8, 2025 [Docket No. 178];

- An application for entry of an order authorizing the retention of Keystone Group as financial advisor [Docket No. 90], which the Bankruptcy Court approved on April 8, 2025 [Docket No. 177]; and

- An application for entry of an order authorizing the retention of Armory Securities, LLC as investment banker [Docket No. 91], which the Bankruptcy Court approved on April 8, 2025 [Docket No. 181].

### E.      DIP Financing

Pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") [Docket No. 16], filed on February 24, 2025, the Debtors requested authority to, among other things, obtain postpetition financing consisting of superpriority secured term loans in an aggregate principal amount of $51,000,000 (the "DIP Loans") under that certain Senior Secured, Super-Priority Debtor in Possession Term Loan Facility, dated as of March 27, 2025 [Docket No. 150-1] (the "DIP Loan Agreement").

The Bankruptcy Court entered the *Final Order (I) Authorizing Debtors to Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Senior Secured Priming Liens; (III) Granting Adequate Protection to the Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "<u>Final DIP Order</u>") [Docket No. 150] on a fully consensual basis on March 26, 2025.

Pursuant to Section 6.18 of the DIP Loan Agreement, the Debtors complied with, or are obligated to comply with, certain Milestones (as defined and set forth in the Final DIP Order):

(a)     On or before March 27, 2025, the Bankruptcy Court shall have entered the Final DIP Order.

(b)     By the date that is no later than May 12, 2025, the Bankruptcy Court shall have entered an order (the "<u>Sale Order</u>") approving the sale of substantially all assets of the Debtors.

(c)     By the date that is no later than May 23, 2025,[4] any court approved sale of the Debtors' assets pursuant to the Sale Motion shall be consummated.

Notably, pursuant to the terms of the Final DIP Order, the Debtors and the DIP Lender negotiated for an "Approved Wind Down Budget" in connection with the Debtors' Plan, which is subject to review and approval by the DIP Lender, in consultation with the Committee. This budget is defined as the Post-Effective Date Budget in the Plan.

**F.     Bidding and Sale Procedures**

On March 3, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of Orders (I) Approving Bidding Procedures; (II) Authorizing the Debtors to (A) Select One or More Stalking Horse Bidders, and (B) To Offer Bid Protections to Such Stalking Horse Bidders; (III) Scheduling an Auction and a Sale Hearing; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Assumption and Assignment Procedures for Executory Contracts and Unexpired Leases; and (VI Granting Related Relief* [Docket No. 71] (the "<u>Bidding Procedures Motion</u>"), pursuant to which the Debtors sought to establish certain procedures (the "<u>Proposed Bidding Procedures</u>") with respect to a competitive sale and marketing process for their assets.

On March 19, 2025, the Bankruptcy Court held a hearing (the "<u>Bidding Procedures Hearing</u>") to consider the entry of the proposed bidding procedures order (the "<u>Proposed Bidding Procedures Order</u>") [Docket No. 116]. That same day, following an uncontested Bidding Procedures Hearing, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 122] approving the Debtors' proposed Bidding Procedures,[5] including the Sale timeline, procedures addressing the circumstance of an insider of the Company submitting a bid to purchase the Debtors' assets, and the designation of the Stalking Horse Bidder, and the Bankruptcy Court

---

[4]     While the DIP Loan Agreement states that the Sale shall be consummated by May 27, 2025, the Final DIP Order states that the Sale shall be consummated by May 23, 2025. The parties intended for May 23, 2025 to be the consummation deadline. Further, pursuant to paragraph 48 of the Final DIP Order, the Final DIP Order controls in the event of any inconsistency.

[5]     Capitalized terms used but not otherwise defined in this section have the meanings ascribed to them in the Bidding Procedures Motion, the Bidding Procedures Order, or the Bidding Procedures, as applicable.

entered the Bidding Procedures Order immediately thereafter [Docket No. 122].[6]  Pursuant to the entered Bidding Procedures Order, the proposed key dates and timeline relating to the Sale and the Auction process were as follows:

| Event | Proposed Date |
|---|---|
| **Non-Binding Indication of Interest Deadline** | Wednesday, March 26, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Cure Notice Deadline** | Friday, April 4, 2025 |
| **Stalking Horse Designation Deadline** | Wednesday, April 9, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Stalking Horse Objection Deadline** | Monday, April 14, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Contract Objection Deadline** | By 4:00 p.m. (prevailing Central Time) on the day that is fourteen (14) days after service of the Cure Notice or the Supplemental Cure Notice, as applicable. |
| **Bid Deadline and Sale Objection Deadline** | Thursday, April 24, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Auction (if necessary)** | Wednesday, April 30, 2025, at 10:00 a.m. (prevailing Central Time) |
| **Deadline to File Notice of Successful Bidder** | As soon as reasonably practicable after the close of the Auction, and, in any event, no later than 5:00 p.m. (prevailing Central Time) on the date that is two (2) days after the close of the Auction. |
| **Post-Auction Objection Deadline** | The date that is two (2) days after the filing of the Notice of Successful Bidder. |

---

[6]   *See Order Approving Bidding Procedures; (II) Authorizing the Debtors to (A) Select One or More Stalking Horse Bidders, and (B) To Offer Bid Protections to Such Stalking Horse Bidders; (III) Scheduling an Auction and a Sale Hearing; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Assumption and Assignment Procedures for Executory Contracts and Unexpired Leases; and (VI) Granting Related Relief* [Docket No. 122], relating to the Bidding Procedures Motion at Docket No. 71.

| Event | Proposed Date |
|---|---|
| **Sale Hearing**<br>**(subject to Court availability)** | No later than Monday, May 12, 2025[7] |
| **Sale Consummation Deadline** | No later than Friday, May 23, 2025, the Sale shall be consummated (the "Sale Consummation Deadline"). |

On April 4, 2025 and May 2, 2025, respectively, the Debtors filed with the Bankruptcy Court the *Notice of Possible Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 166] and the *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 250].

On April 9, 2025, the Debtors filed the *Notice of Filing of Debtors' Stalking Horse Designation* [Docket No. 185], which stated that the Debtors designated TYFCO, LLC as the stalking horse bidder ("TYFCO" or the "Stalking Horse Bidder"). TYFCO is an entity formed by TreeSap's CEO and majority common equity interest owner. As mentioned above, the Bidding Procedures included the contemplation of a scenario in which an insider of the Debtors submitted a bid to purchase all or substantially all of the Debtors' assets. Specifically, these procedures pertaining to bids of insiders described the portions of the sale process a bidding insider could and could not partake in, as applicable. *See* Bidding Procedures Order, p. 15. Throughout the sale process, the Debtors and the Stalking Horse Bidder complied with the procedures set forth in the Bidding Procedures Order.

Pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order, interested parties were invited to submit bids for the Debtors' assets no later than 4:00 p.m. (prevailing Central Time) on April 24, 2025 (the "Qualified Bid Deadline"). In order for a bid to be considered a "Qualified Bid" under the Bidding Procedures, the bid must have met the various requirements described therein. Pursuant to the Bidding Procedures, the Debtors could, in the exercise of their business judgment, hold an auction (the "Auction") if one or more Qualified Bids were received.

In connection with the Bidding Procedures, upon commencement of the Chapter 11 Cases, the Debtors, with the assistance of Armory and their other advisors, commenced a comprehensive sale process to market all of the Debtors' assets. The Debtors, with the assistance of their advisors, prepared marketing materials, including teasers, confidential information memoranda and a virtual data room. One-hundred and twenty-four (124) entities were contacted and identified as potential purchasers. Non-disclosure agreements (each, an "NDA"), together with a teaser, were distributed to all of those potential purchasers. For those potential purchasers that executed an NDA, the Debtors provided each such potential purchaser a confidential information memorandum which included detailed information about the Debtors' operations, services and products. Potential bidders that executed an NDA were also granted access to the virtual data room with historical and projected financial information and were allowed to conduct due diligence and prepare bids. The virtual data room consisted of hundreds of documents, including legal, financial, and operational

---

[7]   The Proposed Bidding Procedures Order filed at Docket No. 116 listed a Sale Hearing date of May 7, 2025. The Bidding Procedures Order entered at Docket No. 122 set the Sale Hearing for May 12, 2025.

information a potential purchaser would likely want to review in considering making a bid. Overall, sixty-eight (68) potential purchasers signed a NDA and were granted access to diligence materials. Over twenty-one (21) different groups participated in meetings with the Debtors' management team and/or undertook site visits during the sale process. Ultimately, thirteen (13) potential purchasers each submitted an indication of interest or letter of intent.

Ultimately, despite a robust marketing process, no Qualified Bids, aside from the Stalking Horse Bid, were received by the Debtors. Accordingly, on April 25, 2025, the Debtors filed the *Notice of Cancellation of Auction and Designation of the Stalking Horse Bid as the Successful Bid* [Docket No. 243]. Also on April 25, 2025, the Debtors filed the *Notice of Filing of Second Amended and Restated Stalking Horse Asset Purchase Agreement* [Docket No. 242], which has attached thereto a copy of the Second Amended and Restated Stalking Horse Asset Purchase Agreement (the "Stalking Horse APA") and a redline reflecting the changes made thereto.

Pursuant to the Stalking Horse APA, the Stalking Horse Bidder is purchasing substantially all the Debtors' assets, on the terms set forth therein, where the total consideration being provided by the Stalking Horse Bidder is over $129 million. The salient terms of the Stalking Horse APA include, without limitation:

  i.    Cash consideration in the amount of $88 million;

  ii.   Assumption of the Debtors' employees' Paid-Time-Off obligations in an estimated amount of $2.59 million;

  iii.  Assumption of undisputed trade payable claims in an estimated amount of no less than $23.9 million;

  iv.   Assumption of all capital lease obligations in an estimated amount of $3.9 million (other than the Capital Farm Credit equipment leases, which shall require the use of sale proceeds to pay the amounts owed thereunder in an estimated amount of $1.8 million);

  v.    Assumption of the Debtors' obligation to pay $1.5 million to Armory in relation to a financing fee earned pursuant to the terms of Armory's engagement letter;

  vi.   Assumption and assignment of substantially all of the Debtors' executory contracts and unexpired leases, with the Stalking Horse Bidder paying any cure costs for such agreements in an estimated amount of $3.1 million (which obviates the need for a significant amount of creditors needing to file rejection damages claims against the Debtors and their estates);

  vii.  Assumption of the imposition of any potential WARN Act liability and other related employee obligations (estimated to total approximately $9.8 million);

  viii. Agreement to hire substantially all of the Company's employees on same or better terms as their current employment with the Debtors; and

  ix.   Releases of the Debtors' current CEO Jonathan Saperstein (who formed TYFCO), his family members, and certain other parties (the "Saperstein Released Parties")

from claims and causes of action by both the Debtors and their bankruptcy estates as well as the Debtors' Prepetition Lenders and DIP Lender (collectively, "CFC").[8]

The uncontested Sale Hearing is scheduled to be held on May 12, 2025. Upon receiving Bankruptcy Court approval, the Debtors anticipate that the Sale Transaction will be consummated shortly thereafter and, in any event, no later than May 23, 2025. The Plan seeks to utilize sale proceeds to, among other things, make Distributions to creditors in accordance with the priority of their Claims.

### G.    Appointment of Creditors' Committee

On March 12, 2025, the United States Trustee for the Southern District of Texas appointed a seven (7) member official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 82]. The Committee is comprised of the following five members: (a) Dynasty Grower Supply; (b) Nutrien Ag Solutions, Inc.; (c) BWI Companies, Inc. (d) Star Roses and Plants; (e) Wilbur-Ellis Company; (f) Nursery Supplies, Inc.; and (g) Ryder Transportation Services.

### H.    Schedules and Bar Dates

On April 9, 2025, each of the Debtors filed their respective schedules of assets and liabilities [Docket Nos. 191, 193, 195, 197, and 199] and statements of financial affairs [Docket Nos. 192, 194, 196, 198, and 200]. The Debtors anticipate filing an amended statement of financial affairs for Debtor TreeSap during the week of May 12, 2025.

On March 14, 2025, the Debtors filed the *Motion for Entry of Order (I) Establishing (A) Bar Dates, and (B) Related Procedures for Filing Proofs of Claim; (II) Approving the Form and Manner of Notice Thereof; and (III) Granting Related Relief* [Docket No. 94] (the "Bar Date Motion") seeking to set a bar date for the filing of Proofs of Claim related to certain prepetition Claims.

On April 8, 2025, the Bankruptcy Court entered the Bar Date Order [Docket No. 182] establishing (i) May 27, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for each Person or entity, but not including Governmental Units, to file a proof of claim (each, a "Proof of Claim") in respect of a prepetition Claim including, for the avoidance of doubt, Secured Claims, priority Claims, and Claims arising under section 503(b)(9) of the Bankruptcy Code, against any of the Debtors (the "General Bar Date"), (ii) August 25, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for governmental units to file Proofs of Claim in respect of any prepetition Claims against any of the Debtors (the "Governmental Bar Date"), (iii) the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules (as defined in the Bar Date Order), as the deadline by which claimants holding Claims affected by such filing, amendment or supplement must file Proofs of Claim with respect to such Claim (the "Amended Schedules Bar Date"), and (iv) the later of (a) the Claims Bar Date, and (b) 5:00 p.m. (prevailing Central Time) on the date that is thirty (30) days after the effective following the service of an order approving rejection (the

---

[8]    Following discussions between the Stalking Horse Bidder and CFC, CFC agreed to the releases of the Saperstein Released Parties as set forth in the Stalking Horse APA. CFC generally supports the Debtors' entry into the Stalking Horse APA with the Stalking Horse Bidder.

"Rejection Date") of an executory contract or unexpired lease as the deadline by which claimants asserting Claims resulting from the Debtors' rejection of such executory contract or unexpired lease must file Proofs of Claim for damages arising from such rejection (the "Rejection Damages Bar Date" and, together with the General Bar Date, Governmental Bar Date, and Amended Schedules Bar Date, the "Bar Dates").

Parties are advised to File Proofs of Claim in accordance with the Bar Date Order.

## I.      Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "Exclusive Plan Period"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "Exclusive Solicitation Period," and together with the Exclusive Plan Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Plan Period currently expires on June 24, 2025, and the Exclusive Solicitation Period runs through August 25, 2025, both are subject to extension upon order of the Bankruptcy Court.

## J.      Key Employee Retention Plan & Key Employee Incentive Plan

Pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (I) Key Employee Retention Plan For Non-Insider Employees and (B) Key Employee Incentive Plan; and (II) Granting Related Relief* [Docket No. 187] (the "KERP/KEIP Motion"), filed on April 9, 2025, the Debtors requested court authority to institute a key employee retention plan to reward 43 non-insider members of employees, in an aggregate award pool of approximately $1,365,000, for their contributions to maintaining ordinary course operations and a key employee incentive plan to incentivize two (2) members for the Debtors' senior management team, in an aggregate pool of approximately $137,000, to maximize the value of the Debtors' estates during these Chapter 11 Cases and aid in the Debtors' sale process.

The deadline for parties in interest to object to the KERP/KEIP Motion was April 30, 2025, except for the United States Trustee whose deadline was extended by the Debtors to May 12, 2025 by stipulation [Docket No. 246]. Pursuant to the terms of the Stalking Horse APA, the Debtors are to withdraw the KERP/KEIP Motion no later than three (3) days after the Closing Date (as defined in the Stalking Horse APA), which is why the Debtors have not sought the Bankruptcy Court's entry of the order authorizing the relief requested in the KERP/KEIP Motion at this time.

## ARTICLE V.
## SUMMARY OF THE PLAN

THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY

BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  HOLDERS OF CLAIMS AGAINST THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

The following table summarizes the material terms of the Plan and certain related agreements:

## A.    Unclassified Claims

### 1.    Unclassified Claims Summary

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Expense Claims | Paid in full | 100% |
| Professional Fee Claims | Paid in full | 100% |
| DIP Facility Claims | Paid in full | 100% |
| Priority Tax Claims | Paid in full | 100% |

### 2.    Unclassified Claims Details

#### (a)    General Administrative Claims

On or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, except to the extent that a Holder of an allowed Administrative Claim and the Debtors agree to less favorable treatment, each Holder of an allowed Administrative Claim will be paid in full in Cash by the Disbursing Agent in full and final satisfaction of such Claim. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

#### (b)    Professional Fee Claims

The Disbursing Agent will pay Professional Fees Claims in Cash in the amount Allowed by the Bankruptcy Code from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

#### (c)    DIP Facility Claims

The DIP Facility Claims will be deemed Allowed under the Plan.  All Allowed DIP Facility Claims not otherwise already paid at closing of the Sale Transaction will be paid in Cash by the Disbursing Agent on the Effective Date or as soon thereafter as reasonably practicable in the discretion of the Plan Administrator.  Upon the foregoing satisfaction of all Allowed DIP Facility

Claims, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility will be of no further force or effect.  For the avoidance of doubt, the DIP Facility Claims will not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation. **These Claims are unclassified under the Plan and are _not_ entitled to vote.**

(d)     **Priority Tax Claims**

Except to the extent that such Holder agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim will, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, either be (1) paid in full in Cash by the Disbursing Agent on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable in accordance with non-bankruptcy law or (2) paid in Cash by the Disbursing Agent in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  **These Claims are unclassified under the Plan and are _not_ entitled to vote**.

**B.     Classified Claims and Interests**

**1.     Recovery Analysis**

In developing the Plan, the Debtors gave due consideration to various restructuring alternatives.  The Debtors conducted a review of their current operations, prospects as an ongoing business, financial projections, and estimated recoveries in a chapter 7 liquidation scenario.  The Debtors believe that any alternative to Confirmation, such as a chapter 7 liquidation, would result in significantly less value available for distribution to its creditors, as demonstrated by the Liquidation Analysis, attached as **Exhibit B** to this Disclosure Statement.

(a)     **Summary of Classified Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3. | Prepetition Lenders Secured Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Impaired | Entitled to Vote |
| 5. | Intercompany Claims | Impaired | Deemed to Reject |
| 6. | Intercompany Interests | Impaired | Deemed to Reject |
| 7. | Equity Interests | Impaired | Deemed to Reject |

(b)      **Classified Claims and Interests Details**

Article III.B of the Plan provides that each Holder of an Allowed Claim or Allowed Interest, as applicable, will receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and such Holder.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, will receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

2.      **Class 1 – Other Priority Claims**

(a)      **Classification**: Class 1 consists of all Other Priority Claims.

(b)      **Treatment**: On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim and the Plan Administrator agree to less favorable treatment, in full satisfaction and release of each Allowed Other Priority Claim, each Holder thereof will receive payment in full in Cash by the Disbursing Agent.

(c)      **Voting**: Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      **Class 2 – Other Secured Claims**

(a)      **Classification**: Class 2 consists of all Other Secured Claims.

(b)      **Treatment**:  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim and the Plan Administrator agree to less favorable treatment, in full satisfaction and release of each Allowed Other Secured Claim, each Allowed Other Secured Claim will, at the option of the Plan Administrator (i) be paid in full in Cash by the Disbursing Agent in an amount equal to the value of the collateral securing such Allowed Other Secured Claim, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such claim unimpaired.

(c)      **Voting**:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

4.      **Class 3 – Prepetition Lenders Secured Claims**

(a)      **Classification**:  Class 3 consists of Prepetition Lenders Secured Claims.

(b)      **Treatment**: The Prepetition Lenders Secured Claim is deemed Allowed in the aggregate principal amount plus accrued and unpaid interest of not less than $[161,000,000] on account of the Prepetition Obligations (as defined in the DIP Order),

plus fees, expenses (including advisors' and professionals' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities, and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  Except to the extent that a Holder of an Allowed Prepetition Lenders Secured Claim agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Prepetition Lenders Secured Claim, the Prepetition Agent, on behalf of each Holder of an Allowed Prepetition Lenders Secured Claim, will, on or as soon as reasonably practicable after the Effective Date in the discretion of the Plan Administrator, receive from the Disbursing Agent the Retained Cash that remains after (i) full satisfaction of the Allowed DIP Facility Claims, and (ii) the amounts and Claims covered by the Post-Effective Date Budget are paid or an appropriate reserve is established in the discretion of the Plan Administrator.  The Prepetition Agent will then pay each Holder of an Allowed Prepetition Lenders Secured Claim their allocable share of the Retained Cash.

The Prepetition Lenders Deficiency Claim shall be in amount equal to the Allowed amount of the Prepetition Lenders Secured Claim less any payments received on account of the Prepetition Lenders Secured Claim,  shall be treated as a Class 4 General Unsecured Claim, and shall be entitled to vote and receive distributions as the holder of a Class 4 General Unsecured Claim in accordance with the Plan.

(c)     **Voting**:  Class 3 is Impaired under the Plan.  Holders of Prepetition Lenders Secured Claims are entitled to vote on the Plan and shall receive Ballots.

### 5.     Class 4 – General Unsecured Claims

(a)     **Classification**:  Class 4 consists of all General Unsecured Claims, including, without limitation, the Prepetition Lenders Deficiency Claim.

(b)     **Treatment**:  On the Effective Date, each General Unsecured Claim will be discharged and released, and each Holder of an Allowed General Unsecured Claim will be entitled to receive from the Disbursing Agent its Pro Rata Share of (i) the GUC Recovery Pool, and (ii) proceeds (if any) realized from the Plan Administrator's pursuit of the Retained Causes of Action.

(c)     **Voting**:  Class 4 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote on the Plan and shall receive Ballots.

### 6.     Class 5 – Intercompany Claims

(a)     **Classification**:  Class 5 consists of all Intercompany Claims.

(b)     **Treatment**:  On the Effective Date, each Intercompany Claim will be cancelled, released and extinguished, and each holder of an Intercompany Claim will not receive or retain any distribution, property, or other value on account of its Intercompany Claim.

(c) **Voting**: Class 5 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7. **Class 6 – Intercompany Interests**

(a) **Classification**: Class 6 consists of all Intercompany Interests.

(b) **Treatment**: On the Effective Date, each Intercompany Interest will be cancelled, released and extinguished, and each holder of an Intercompany Interest will not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

(c) **Voting**: Class 6 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8. **Class 7 – Existing Equity Interests**

(a) **Classification**: Class 7 consists of all Existing Equity Interests.

(b) **Treatment**: On the Effective Date, all Existing Equity Interests will be cancelled, released and extinguished, and each holder of an Existing Equity Interest will not receive or retain any distribution, property, or other value on account of its Equity Interest.

(c) **Voting**: Class 7 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

Article III.C of the Plan provides that any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) will be deemed eliminated from the Plan for voting to accept or reject the Plan and for determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**C. Acceptance or Rejection of the Plan**

Article IV of the Plan sets forth certain additional rules governing the tabulation of votes under the Plan, and related matters. Among other things, it provides that (a) Claims in Classes 1 and 2 are Unimpaired under the Plan and therefore the Holders of such Claims are presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code; (b) Claims in Classes 3 and 4 are Impaired under the Plan and therefore the Holders of such Allowed Claims are entitled to vote to accept or reject the Plan; (c) Claims and Interests in Classes 5 through 7 are Impaired under the Plan and Holders of such Claims or Interests will receive no Distribution under the Plan on account of such Claims or Interests and are therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code; (d) in the event a Class of Claims that is entitled to vote on the Plan rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to 1129(b) of the Bankruptcy Code, which permits confirmation of a plan provided that at least

one Class entitled to vote has voted to accept the plan and certain other requirements are met, including that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, non-consenting class of claims or interests under the Plan; (e) the allowance, classification, and treatment of all Allowed Claims and Interests, and the respective Distributions (if any) and treatments under the Plan will take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; and (f) the Debtors have, and on the Confirmation Date, will be deemed to have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any other applicable law and therefore the Debtors will be granted the protections of section 1125(e) of the Bankruptcy Code.

Article IV.C. of the Plan provides that the Plan Administrator reserves the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination rights relating thereto.

**D.      Treatment of Executory Contracts, Unexpired Leases and Insurance Policies**

**1.      Rejection of Executory Contracts and Unexpired Leases**

Pursuant to Article VI.A of the Plan, except as otherwise provided in the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale Transaction, and are not the subject of a pending motion or notice to reject, assume, or assume and assign as of the Effective Date, and (2) have not expired under their own terms prior to the Effective Date; *provided*, *however*, that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and their Estates, the Debtors' officers, managers and directors, and the Post-Effective Date Debtors.  **The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.**

**2.      Debtors' Preexisting Obligations Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

**3.      Assumption of the D&O Policies**

The Debtors and the Post-Effective Date Debtors, as applicable, shall assume all of the D&O Policies pursuant to section 365(a) of the Bankruptcy Code that have not been assumed pursuant to the Sale Transaction.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Policies and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably

necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secured for the insureds the benefits of the D&O Policies.

In addition, after the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under a D&O Tail Policy covering the Debtors' current boards of directors in effect on or after the Petition Date and, subject to the terms of the applicable D&O Tail Policy, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

### 4.      Rejection Damages Claims

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan (including, without limitation, Claims that assert any indemnification right pursuant to corporate governance documents of the Debtors' that have been rejected) must be filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Article VI.A above, and the deadline for filing any rejection damages Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court shall be the applicable deadline under such order or the Claims Bar Date Order, as applicable.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim shall be classified and treated as a Class 4 General Unsecured Claim.

### E.      Distributions

<u>Article VII</u> of the Plan sets forth the mechanics by which Plan Distributions will be made. As set forth more fully therein, <u>Article VII</u> of the Plan provides, among other things, that, unless otherwise provided in the Plan,

(a)      on the Initial Distribution Date, each Holder of an Allowed Claim against the Debtors shall receive the amount of the Distribution that the Plan provides for Allowed Claims in the applicable Class.  Subsequent Distributions shall be made, if determined by the Plan Administrator to be practicable and appropriate; *provided* that the Plan Administrator may refrain from making a Distribution to the extent the Plan Administrator reasonably determines that the costs of making such Distribution are not reasonable in comparison to the amount of such Distribution and instead may reserve making any subsequent Distributions until a future Distribution date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII and Article VIII of the Plan;

(b)      on and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date.  Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution

Record Date, and will be entitled for all purposes herein to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date;

(c)      the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holder's address on its Proof of Claim, if applicable, (b) such Holder's address listed on a notice filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' Schedules;

(d)      if any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest. Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the Distribution was returned. After such date, such unclaimed Distribution shall revert to the Post-Effective Date Debtors and their Estates (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Holder of such Claim shall receive no Distribution from the Debtors on account of such Claim;

(e)      for purposes of making Distributions on the Initial Distribution Date only, the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business on the Distribution Record Date;

A more detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims or Interests is set forth above.

## F.      Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests

Article VIII of the Plan governs the resolution of Disputed Claims and Interests.

Pursuant to Article VIII.A of the Plan, no Claim will be deemed Allowed unless and until such Claim is Allowed under the Bankruptcy Code, the Plan or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim. The Plan Administrator after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim. Any Claim filed after the applicable Claims Bar Date is automatically deemed Disallowed unless such Holder of the Claim obtains Bankruptcy Court approval to file a late claim.

Pursuant to Article VIII.B of the Plan, the Plan Administrator will have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims. From and after the Effective Date, the Plan Administrator, may settle or compromise any Disputed Claim, and may administer and adjust the Claims Register to reflect such settlements or compromises, without notice to, action, order, or approval of the Bankruptcy Court. The Plan Administrator may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary. With respect to the foregoing rights of the Plan Administrator to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator will stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege. The Plan

Administrator will succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

Article VIII.C addresses estimation of Claims.  It provides that the Plan Administrator may request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator has previously objected to such Claim.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning an objection to a Claim.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.   All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.

Article VIII.D addresses Distributions after the Allowance of a Claim, and provides that to the extent that a Disputed Claim ultimately becomes an Allowed Claim as a Claim other than a Subordinated Claim, Distributions (if any) will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator will provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

Article VIII.E addresses the disallowance of certain Claims, and provides that any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code will be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Post-Effective Date Debtors.

### G.    Conditions Precedent to Confirmation

Article IX.A of the Plan sets forth the conditions precedent to Confirmation, and related matters.  The conditions precedent set forth at Article IX.A include that:

1.    the Disclosure Statement Order will have been entered by the Bankruptcy Court on a final basis;

2.    the Confirmation Order will have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Sale Order and otherwise be in form and substance reasonably acceptable to the Debtors, and will not have been vacated, amended or otherwise modified;

3.    the Sale Order will constitute a Final Order and will not have been vacated, amended or otherwise modified; and

4.      the Sale Transaction Documents will not have been terminated in accordance with their terms.

## H.      Conditions Precedent to the Effective Date

Article IX.B of the Plan sets forth the conditions precedent to the Effective Date, and related matters.  The conditions precedent set forth at Article IX.B include that:

1.      the Confirmation Order will have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Sale Order and otherwise be in form and substance reasonably acceptable to the Debtors, and will not have been vacated, amended or otherwise modified;

2.      the Plan and all other documents contemplated thereby, including any amendments, modifications, or supplements thereto, will be consistent in all material respects with the Sale Order and otherwise be in form and substance reasonably acceptable to the Debtors;

3.      all conditions precedent to the effectiveness of the Sale Transaction Documents will have been satisfied or waived pursuant to the terms thereof, and the consummation of such Sale Transaction will have occurred prior to the Effective Date;

4.      the Debtors will have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and no order, injunction or judgment will have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by the Plan, and no law will have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by the Plan;

5.      the Plan Administration Agreement will have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof will have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement will otherwise be in form and substance reasonably acceptable to the Debtors;

6.      all actions, documents, certificates, and agreements necessary to implement the Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect;

7.      the Wind-Down Account shall have been established and funded in an amount consistent with the Post-Effective Date Budget;

8.      the GUC Recovery Pool Escrow Account will have been established and funded with the GUC Recovery Pool;

9.      the Professional Fee Escrow Account will have been established and funded with the Professional Fee Escrow Amount;

10.     all Statutory Fees due and payable prior to the Effective Date will have been paid by the Debtors; and

11.     all Allowed DIP Facility Claims will be repaid and satisfied in full by the sale proceeds received by the Debtors upon closing of the Sale Transaction.

Article IX.C provides that the Debtors may waive the conditions to Confirmation and Consummation of the Plan with or without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

Article IX.D addresses the effect of non-occurrence of the conditions to Confirmation or Consummation. It provides that if the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I.      Releases

Article X of the Plan addresses releases, injunctions and related provisions. These provisions include, but are not limited to, preservation of the rights of the Debtors and Plan Administrator to setoff against Allowed Claims and Interests (Article X.E). In addition, Articles X.B, X.C, and X.D of the Plan contain important releases, injunctions, and exculpatory provisions. These provisions are highlighted below.[9]

The following definitions are important to understanding the scope of the releases being given under the Plan:

"**Exculpated Parties**" means collectively: (a) the Debtors; (b) the Independent Director; and (c) the Committee and each of the members of the Committee.

"**Released Parties**" means collectively: (a) each Debtor and Post-Effective Date Debtor; (b) the Independent Director; (c) the CRO; (d) the DIP Lender; (e) the Prepetition Agent; (f) the Prepetition Lenders; (g) the Plan Administrator; (h) the Committee and its members; (i) the Professional Persons; and (j) with respect to each of the foregoing Persons and Entities in clauses (a) through (i), each Person's or Entity's Representatives.

"**Representatives**" means, with respect to an Entity or Person, such Entity's or Person's current and former (i) officers, (ii) directors, (iii) managers, (iv) principals, (v) members,

---

[9]     The Debtors and their Estates are continuing their ongoing internal investigation. Nothing herein will constitute or be deemed a waiver of any rights related to such internal investigation.

(vi) employees, (vii) agents, (viii) advisory board members, (ix) financial advisors, (x) Affiliates, (xi) partners, (xii) attorneys, (xiii) accountants, (xiv) trustees, (xv) investment bankers, (xvi) consultants, (xvii) representatives, and (xviii) other professionals and advisors, each in their capacity as such.

### 1.  Debtor Release (<u>Article X.B</u> of the Plan)

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "<u>Debtor Released Claims</u>"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, the DIP Order and the DIP Loan Documents, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission; <u>provided</u>, <u>however</u>, that the foregoing "<u>Debtor Release</u>" shall not operate to waive or release, and the "<u>Debtor Released Claims</u>" shall not include, any Cause of Action of any Debtor or its Estate: (1) against a Released Party arising from any obligations owed to the Debtors pursuant to an Executory Contract or Unexpired Lease that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2) expressly set forth in and preserved by the Plan or related documents; (3) that is of a commercial nature and arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (4) against a Holder of a Disputed Claim to the extent necessary to administer and resolve such Disputed Claim solely in accordance with the Plan; or (5) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross**

negligence, willful misconduct or criminal conduct (other than with respect to or relating to the Adversary Actions). Notwithstanding anything to the contrary in the foregoing, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under the Plan or any document, instrument or agreement executed in connection with the Plan with respect to the Debtors, the Post-Effective Date Debtors, or the Estates.

2.   Exculpation (<u>Article X.C</u> of the Plan)

To the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article X of the Plan, effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of the Plan, making Distributions, implementing the Wind-Down, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions in furtherance of any of the foregoing; <u>provided</u>, <u>however</u>, that none of the foregoing provisions shall operate to waive or release (i) any Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under the Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on the Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

3.   Permanent Injunction (<u>Article X.D</u> of the Plan)

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Post-Effective Date Debtors, or the Exculpated Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article X hereof, without the Bankruptcy Court (i) first determining,

36

after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Post-Effective Date Debtor, or Exculpated Party, as applicable.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Post-Effective Date Debtor, Exculpated Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  Any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION

### A.    Transaction Effective as of the Effective Date

The transactions contemplated by the Plan will be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their officers or directors, or any other Person or Entity.

On or before the Effective Date, each of the Debtors will assign and transfer any and all of their respective remaining assets, including the Retained Causes of Action, to Post-Effective Date TreeSap such that on the Effective Date:

    i.    all such assets of the Debtors will vest (or revest, as applicable) and be owned by Post-Effective Date TreeSap and will be considered Plan Administration Assets;

    ii.    all Claims and Causes of Action are considered to be held against Post-Effective Date TreeSap;

    iii.    any right to object to any Claims or Causes of Action will be the right of Post-Effective Date TreeSap and the Plan Administrator; and

    iv.    all Retained Causes of Action will be held by Post-Effective Date TreeSap and pursued by the Plan Administrator on behalf of Post-Effective Date TreeSap.

As of the Effective Date, all property of Post-Effective Date TreeSap will be free and clear of all Claims, encumbrances, Equity Interests, charges, and Liens except as provided or contemplated in the Plan or as provided in the Confirmation Order.

On the Effective Date, all of the corporate organizational documents of the Debtors will be deemed amended without further action by any party to (i) appoint the Plan Administrator and vest

the Plan Administrator with all authority and power to oversee the Wind-Down of the affairs of the Debtors and Post-Effective Date Debtors; and (ii) eliminate any voting or other governance rights of any member or manager in the Debtors and Post-Effective Date Debtors, as applicable.

## B.      General Settlement of Claims and Interests

Article V.B of the Plan provides that, unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  Such settlement and compromise will not include or affect any Causes of Action listed in the Schedule of Retained Causes of Action.

The Plan will be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VII of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be and will be final.

## C.      Intercreditor Agreement

Article V.C of the Plan provides that, except as expressly provided in the Plan, all rights, entitlements, and distributions will be subject to the Intercreditor Agreement, the priorities and payment waterfalls of which will be incorporated, preserved, and enforced by the Plan, the Debtors, the Plan Administrator and, as applicable, the Post-Effective Date Debtors, pursuant to section 510 of the Bankruptcy Code.

## D.      Administrative Consolidation for Voting and Distribution Purposes Only

The Plan is premised upon the substantive consolidation of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, the resulting treatment of all Claims and Interests and making Plan Distributions. Each Debtor will continue to maintain its separate corporate existence for all purposes other than the treatment of Claims and Interests under the Plan. On the Effective Date, and except as otherwise expressly provided in the Plan, solely for voting, confirmation, and distribution purposes with respect to each Class of Claims or Interests: (a) all Claims in each respective Class will be deemed merged or consolidated and treated as Claims against the Debtors on a consolidated basis; (b) each Claim in each respective Class will be deemed a single Claim against Post-Effective Date TreeSap; (c) any Claim in a given Class based on a guaranty by any Debtor of the obligations of any other Debtor will be deemed eliminated and extinguished, so that any Claim against any Debtor and any guarantee thereof by any other Debtor, and any joint or several liability of any of the Debtors, will be deemed to be one obligation of Post-Effective Date TreeSap; and (d) each Holder of any Allowed Claim or Interest in a given Class will be entitled to a single recovery on account of such Claim or Interest, in accordance with the treatment provided under the Plan for such Class,

regardless of whether such Holder filed Proofs of Claim against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt.

### E. Uses of Cash

Article V.E of the Plan provides that, on or prior to the Effective Date, the Retained Cash will be placed into accounts established and maintained by the Debtors, including, as applicable, the GUC Recovery Pool Escrow Account, the Professional Fee Escrow Account, and the Wind-Down Account. On the Effective Date, all Retained Cash, including the Wind-Down Account and the GUC Recovery Pool Escrow Account, but not the Professional Fee Escrow Account, will vest in the Post-Effective Date TreeSap and its Estate pursuant to Article V.I of the Plan.

The Post-Effective Date Budget will be funded from Retained Cash in order to ensure the payment in full of all Administrative Claims, Other Secured Claims, Other Priority Claims, Priority Tax Claims, the GUC Recovery Pool, the Wind-Down Amount, and Professional Fee Escrow Amount. The remaining amount of Retained Cash will be paid to Holders of Allowed Prepetition Lenders Secured Claims in accordance with the treatment of Class 3 Claims set forth in Article III.B.3 of the Plan; *provided*, *however*, that in the event the Wind-Down Amount is insufficient to provide for full payment of the Plan Administration Expenses and Allowed Professional Fee Claims, the Plan Administrator shall use Retained Cash to fund the shortfall.

### F. Plan Administrator

Article V.F of the Plan vests the Plan Administrator with the authority and right on behalf of each of the Debtors and Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan. The Plan Administrator will be appointed by the Debtors in consultation with counsel to the DIP Lender and Prepetition Lenders.

Article V.F of the Plan provides that the Debtors or Post-Effective Date Debtors, as applicable, will indemnify and hold harmless, as a Plan Administration Expense, (i) the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement, and (ii) such other Persons retained by the Plan Administrator (collectively, the "Plan Administration Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administration Indemnified Party's willful misconduct or gross negligence, with respect to the Debtors or the implementation or administration of the Plan.

### G. The Plan Administration Assets

Article V.G of the Plan provides that, on the Effective Date, the Plan Administrator will sign the Plan Administration Agreement and accept (i) the Wind-Down Account, the Professional Fee Escrow Account, the GUC Recovery Pool Escrow Account (in each case including the Cash therein); (ii) the D&O Tail Coverage and any D&O Tail Policies (to the extent purchased prior to the Effective Date); and (iii) any and all of the Debtors' respective assets remaining upon closing of the Sale Transaction, including the Retained Causes of Action, that will be transferred and assigned to Post-Effective Date TreeSap in accordance with Article V.A of the Plan (collectively, the "Plan Administration Assets"). As of the Effective Date, all Plan Administration Assets and

all assets dealt with in the Plan will be free and clear of all Liens, Claims, and Interests except as otherwise further provided in the Plan or in the Confirmation Order.

After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and Plan Administration Expenses, and to the extent that the Plan Administrator determines in good faith and on a reasonable basis, that substantially all of the Claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied in full, the Plan Administrator will remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to a non-profit charitable organization qualifying under Section 501(c)(3) of the I.R.C.; *provided that* such charity will be selected by the Plan Administrator in its sole discretion.

## H.    Cancellation of Existing Securities and Agreements

Article V.H of the Plan provides that, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest will be cancelled and of no further force and effect, except that each of the foregoing will continue in effect solely to the extent necessary to (a) allow Holders of such Claims or Interests to receive Distributions under the Plan; (b) allow the Debtors and the Plan Administrator, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to the Plan on account of such Claims; and (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or Interests pursuant to any such applicable document or instrument.

## I.    Corporate Action

Article V.I of the Plan provides that, upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) will be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, will be deemed to have occurred and will be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

On and after the Effective Date, the Plan Administrator will be authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## J.    Exemption from Transfer Taxes and Fees

Article V.J of the Plan provides that, to the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer pursuant to, in contemplation of, or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or fee, or other similar tax, fee or governmental

assessment, and the appropriate state or local government officials, recording officers or agents, wherever located and by whomever appointed, will comply with the requirements of section 1146(a) of the Bankruptcy Code and will forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

### K.  Directors, Managers, and Officers of the Debtors

Article V.K of the Plan provides that, following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers, directors and managers of each of the Debtors will continue in their respective capacities in accordance with the applicable by-laws or other organizational documents, unless otherwise agreed between the Debtors and the Purchaser, and the Debtors will execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

On and after the Effective Date, the Plan Administrator will serve as the sole shareholder, interest holder, officer, director or manager of each of the Debtors, as applicable, under applicable state law.

### L.  Insurance Policies

Article V.L of the Plan provides that, D&O Tail Coverage will be purchased, whether pre-Effective Date by the Debtors or post-Effective Date by the Plan Administrator.  To the extent such D&O Tail Coverage is purchased after the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such D&O Tail Coverage for the full term of such D&O Policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage and the D&O Policies in all respects.  Further, to the extent such D&O Tail Coverage is purchased after the Effective Date, premiums and other costs associated with purchasing and maintaining the D&O Tail Coverage will constitute Plan Administration Expenses.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, to the extent any Insurance Policies have not already been assumed and assigned to the Purchaser pursuant to the Sale Order or Sale Transaction Documents, (i) on the Effective Date, the Debtors will be deemed to have assumed all such Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) neither Confirmation nor Consummation of the Plan will alter, impair or otherwise modify the terms and conditions of any such Insurance Policy or the coverage provided pursuant thereto.

### M.  Cooperation Between Plan Administrator and Purchaser

Article V.M provides that prior to the completion of the Wind-Down and closing of the Chapter 11 Cases of the Post-Effective Date Debtors, the Plan Administrator will have reasonable access to, and the reasonable assistance of, the Purchaser, and to the assets, software, and systems of the Debtors, to the extent necessary to (a) reconcile Claims in connection with the Chapter 11 Cases, and (b) with respect to the Plan Administrator, complete the Wind-Down, in each case consistent with the Asset Purchase Agreement and the Plan Administration Agreement.  Prior to the completion of the Wind-Down and closing of the Chapter 11 Cases of the Post-Effective Date Debtors, the Purchaser will have reasonable access to, and the reasonable assistance of, the Plan

Administrator, and to the assets, software, and systems of, as applicable, the Post-Effective Date Debtors, (x) to continue to perform its obligations to holders of Assumed Trade Payable Claims and any other obligations of the Debtors assumed by the Purchaser under the Plan or the Sale Order and (y) as otherwise necessary in the ordinary course of operations.  Further, in accordance with Section 10.6 of the Asset Purchase Agreement, the Post-Effective Date Debtors and the Plan Administrator agree to cooperate with the Purchaser after the Closing Date to enable the Purchaser to move, liquidate and/or otherwise dispose of the Acquired Assets (as defined in the Asset Purchase Agreement) located on or used in association with owned and leased real property which is not part of the Acquired Assets (subject in all respects to the conditions set forth in Section 10.6 of the Asset Purchase Agreement).

## ARTICLE VII.
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (a) accepted by all Impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) in the "best interests" of the holders of Claims and Interests Impaired under the Plan; and (c) feasible.

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold the Confirmation Hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled for **[July 8], 2025 at [9:00 a.m.]**, prevailing Central time.  The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket in the Chapter 11 Cases.

### B.    Objections to Confirmation of the Plan

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature, and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge Alfredo Perez, together with proof of service thereof, and served upon all of the below parties so as to be received by **[June 27], 2025 at [4:00 a.m.] (prevailing Central Time)** (the "Objection Deadline").

| Debtors | Counsel to the Debtors |
|---|---|
| TreeSap Farms, LLC<br>5151 Mitchelldale St., Ste. B-2<br>Houston, TX 77292-5279<br>Attn: Bret C. Jacobs<br>(bjacobs@thekeystonegroup.com) | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Attn: Timothy A. ("Tad") Davidson II<br>(taddavidson@hunton.com), Joseph P. Rovira<br>(jrovira@hunton.com), and Catherine A. Rankin |

| | |
|---|---|
| | (crankin@hunton.com) |
| **United States Trustee** | **Counsel to the Creditors' Committee** |
| Office of The United States Trustee 515 Rusk Street, Suite 3516 Houston, Texas 77002 Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov) | McDermott Will & Emery LLP 2501 North Harwood, Suite 1900 Dallas, Texas 75201 Attn: Charles R. Gibbs (crgibbs@mwe.com) and Marcus Helt (mhelt@mwe.com) |
| **Counsel to the DIP Lender and Prepetition Agent** | |
| Porter Hedges LLP 1000 Main Street, 36th Floor Houston, TX 77002 Attn: Eric M. English (eenglish@porterhedges.com), M. Shane Johnson (sjohnson@porterhedges.com), and James A. Keefe (jkeefe@porterhedges.com) | |

### C.     Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

### 1.     Confirmation Requirements.

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- unless the Holder of a particular Claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such Claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is unlikely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

### (a) Acceptance

Claims in Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan; Classes 1 and 2 are Unimpaired and are therefore presumed to have accepted the Plan; Classes 5, 6, and 7 are Impaired and (i) will receive no Distributions under the Plan on account of their Claims or Interests, (ii) are deemed to have rejected the Plan, and (iii) are not entitled to vote to accept or reject the Plan.

The Debtors also will seek confirmation of the Plan over the objection of any individual Holders of Claims who are members of an accepting Class. There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### (b) Unfair Discrimination and Fair and Equitable Test

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors, and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

### (c) Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. The Plan provides for the Distribution of the proceeds from the sale of substantially all of the Debtors' assets and the subsequent dissolution of the Debtors. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### (d) Best Interests Test

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the Holders of Claims and Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would have received pursuant to the liquidation of the Debtors under chapter 7.

The Debtors, with the assistance of their restructuring and legal advisors, are preparing a liquidation analysis that will summarize the Debtors' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases are converted to cases under chapter 7 on [July 31], 2025 (the "**Liquidation Analysis**"), which will be attached as **Exhibit B** to an amended version of this Disclosure Statement at a later date. The Liquidation Analysis will summarize the liquidation value of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court liquidates the assets of the Debtors' estates.

The Liquidation Analysis will contain a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis will also be based on assumptions related to liquidation decisions that are subject to change and significant economic uncertainties and contingencies beyond the control of the Debtors and their management. The chapter 7 liquidation period is assumed to last between [3 and 6] months following the appointment of a chapter 7 trustee, given that substantially all the assets will have been sold as part of the Sale Transaction, but allowing for, among other things, evaluation of any other potential claims or causes of action. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### D.    Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### E.    Consummation

The Plan will be Consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan have been satisfied or waived pursuant to the Plan. The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

### F.    Dissolution of Committee

Pursuant to <u>Article XII.D</u> of the Plan, the Committee will dissolve, and the current and former members of the Committee will be released from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided* that the Committee and its professionals will have the right to file, prosecute, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with <u>Article II.A.2</u> of the Plan.

### G.    Modification of Plan

Subject in all respects to the limitations and consent rights contained in the Plan, (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order in accordance with section 1127(a) of the Bankruptcy Code and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code.  A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### H.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which the Plan was revoked or withdrawn or for which Confirmation or Consummation of the Plan did not occur: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

### I.    Post-Confirmation Jurisdiction of the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date and in addition to the matters over which the Bankruptcy Court will have retained jurisdiction pursuant to the Sale Order, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest, including equitable

subordination or other subordination of any Claim or Interest pursuant section 510 of the Bankruptcy Code;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- resolve any matters related to the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

- resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

- ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes related thereto;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

- enforce all orders previously entered by the Bankruptcy Court;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person or Entity's obligations incurred in connection with the Plan;

- hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

- hear and determine disputes arising in connection with the interpretation, implementation, enforcement of the Sale Order, Asset Purchase Agreement, or other document(s) governing or relating to the Sale Transaction including, without limitation, and all matters arising in connection with the Sale Transaction;

48

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan;

- enforce the terms and conditions of the Plan and the Confirmation Order, and maintain the integrity of the Plan following Consummation;

- hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- resolve any cases, controversies, suits, or disputes with respect to the Release, Exculpation, indemnification, and other provisions contained in Article X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order, or any release or exculpation adopted in connection with the Plan;

- enter an order or orders concluding or closing the Chapter 11 Cases; and

- hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XI of the Plan, such provisions will not affect and will not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided in the Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court will have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose before the Effective Date.

## ARTICLE VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and their key constituents. The Debtors have determined that the Plan is the best alternative available to maximize value for all stakeholders. If the Plan is not confirmed and consummated, the alternatives to the Plan are

(A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan, (B) a liquidation under chapter 7 of the Bankruptcy Code, or (C) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests eligible to pursue available non-bankruptcy remedies. These alternatives to the Plan, however, are unlikely to benefit Holders of Claims and Interests.

### A.    Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan.  However, it is unclear whether the Debtors could secure the same funding and terms negotiated in connection with the Plan in a subsequent plan.  The Debtors will have no ongoing operations after funding of the Sale Transaction, so they would have no source of revenue to pursue an alternative path.

### B.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that the Debtors believe a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis attached as **Exhibit B** to a later filed version of this Disclosure Statement.

As will be demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals.

As set forth above, substantially all of the Debtors' assets will be sold through the Sale Transaction.  The Debtors believe that the Plan provides a greater recovery to Holders of Allowed Prepetition Lenders Secured Claims and General Unsecured Claims than would a chapter 7 liquidation, for several reasons.  First, liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to Holders of Claims and increase the magnitude of claims to those proceeds.  The Debtors believe that in a liquidation under chapter 7, before creditors receive any Distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets.  The Debtors believe that such recovery would be unavailable to such creditors in a chapter 7 liquidation.

### C.    Dismissal of Chapter 11 Cases

If the Chapter 11 Cases are dismissed, Holders of Claims or Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Interests in the Debtors.  However, in that event, Holders of Claims or Interests would face the costs and difficulties of attempting, each on its own, to recover from a non-operating entity.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

## ARTICLE IX.
## FACTORS TO CONSIDER BEFORE VOTING

Before voting to accept or reject the Plan, holders of Claims entitled to vote should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.    Certain Bankruptcy Law Considerations

### 1.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for confirmation or that such modifications would not require re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting Classes voted for the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization or otherwise.

### 2.    Risk of Failing to Satisfy the Vote Requirement

If the Debtors do not obtain sufficient votes from the Classes entitled to vote, the Debtors will seek to accomplish an alternative chapter 11 plan or seek to "cram down" (*i.e.*, achieve non-consensual confirmation of—see note 3 below) the Plan on non-accepting Classes.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to Holders of Allowed Claims as those proposed in the Plan.

### 3.    Non-Consensual Confirmation

If any impaired class of claims or interests does not accept or is deemed not to accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class(es).  The Debtors believe that the Plan satisfies these requirements.

### 4.    Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be

no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 5.      Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entire Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not object to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 6.      Releases, Injunctions, Exculpation Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Released Parties or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 7.      Risk of Failure to Consummate the Plan

As of the date of this Disclosure Statement, there can be no assurance that the conditions precedent to Consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.  Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no Distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 8.      Conversion into Chapter 7 Cases

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 9.      Amendment of Plan Before Confirmation

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and as needed or desirable for Confirmation.  The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  In addition, if the Debtors seek to modify or amend the Plan after receiving sufficient acceptances, but prior to Confirmation, re-solicitation may be required.

**10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**11. The Debtors or Plan Administrator, as Applicable, May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors or Plan Administrator, as applicable, reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement. Further, the Committee or other parties in interest may object to the amount and/or classification of any Claim under the Plan in accordance with the Bankruptcy Code.

**12. Other Parties-in-Interest May Be Permitted to Propose Alternative Plans that Are Less Favorable to Certain Stakeholders**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative chapter 11 plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a chapter 11 plan for the first 120 days after filing. Such exclusivity period can be reduced or terminated, however, upon order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then be permitted to propose one or more alternative plans.

**13. Risk of Re-solicitation of the Plan**

There can be no assurance that the Bankruptcy Court will not require modifications to the Plan that would require re-solicitation of votes from the Voting Classes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan if votes are re-solicited. Re-solicitation could delay confirmation of the Plan, and if the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan or other proceeding.

**14. Insufficient Cash to Continue in Chapter 11**

The Debtors may not have sufficient Cash to continue operating in chapter 11 for a long time. It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

**15. Pro Rata Share Distributions**

The Debtors, with the assistance of their relevant advisors, have made certain assumptions regarding the Allowance and Disallowance of certain Claims entitled to Pro Rata Share

Distributions under the Plan.  If Claims in certain Classes entitled to Pro Rata Share Distributions are Allowed in amounts that exceed the assumptions the Debtors and their relevant advisors have relied upon, the recoveries of Holders of Claims entitled to Pro Rata Distributions in other Classes would be impacted.

### B.    Additional Factors

#### 1.    Debtors Could Withdraw Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

#### 2.    Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 4.    No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

#### 5.    No Admission Made

Nothing in this Disclosure Statement or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

#### 6.    Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the

underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.

Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan. Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

### 7. The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim Filed in these Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a pro rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes. At this time, the Debtors do not anticipate making any distribution to Holders of Claims or Interests in Classes 5 through 7.

### 8. The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries

It is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

### 9. The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash

It is possible that Allowed General Administrative Claims, Professional Fee Claims, DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees, and the costs of the Wind-Down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

### 10. Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases

The Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from pending litigation. An adverse outcome against the Debtors with respect to such litigation could materially affect the Debtors' ability to consummate the Plan and would result in

protracted Chapter 11 Cases.  The occurrence of such contingencies could affect distributions to holders of Claims under the Plan, and/or result in protracted Chapter 11 Cases.

**11.     The Debtors May Be Adversely Affected by Future Litigation**

The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor.  In general, litigation can be expensive and time consuming to bring or defend.  Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions.  It is also possible that certain parties will commence litigation over the treatment of their Claims under the Plan.  It is impossible to predict the potential litigation that the Debtors may become party to, nor the final resolution of any litigation.  The effect of any such litigation on the Debtors' business and financial stability, however, could be material.

## ARTICLE X.
## CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the plan to the Debtors and certain holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the Applicable Tax Law or new interpretations of the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any opinion of counsel or ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).

This discussion assumes that the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and, unless otherwise indicated below, that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form, and that the

Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to holders of Claims or Equity Interests that act or receive consideration in a capacity other than any other holder of a Claim or Equity Interest of the same class or classes, and the tax consequences for such holders may differ materially from that described below.  Except where may be specifically noted below, this summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired.

The following discussion generally assumes that the Debtors themselves will be the Post-Effective Date Debtors (and not any successor, by merger, consolidation or otherwise, to the Debtors), and that all Distributions to Holders of Claims will be taxed accordingly.  Thus, all references in this summary to the Debtors as related to periods after the Effective Date should be considered references to the Post-Effective Date Debtors as a continuation of the Debtors.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Equity Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim or Equity Interest that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).  The following discussion is only applicable to a U.S. Holder.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

### A.    Consequences to Debtors

TreeSap believes that it is properly classified as a partnership for U.S. federal income tax purposes, and each of TSH Opco, LLC, TSV Opco, LLC, TSV Reco, LLC and TreeSap Florida, LLC (the "Operating Companies") are treated as disregarded entities for U.S. federal income tax purposes.  As a partnership or a disregarded entity, neither TreeSap nor the Operating Companies are subject to U.S. federal income tax.  Instead, each partner of TreeSap is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction, and credit of such Debtors.  Accordingly, the U.S. federal income tax consequences of the transactions contemplated by the Plan generally will not be borne by the Debtors, but instead will be borne by the partners of TreeSap.

**THE DISCUSSION BELOW ASSUMES THAT TREESAP IS CURRENTLY CLASSIFIED, AND WILL CONTINUE TO BE, CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES.**

      1.      **Sale Transaction**

The Debtors expect to sell all or substantially all of their assets in the Sale Transaction and to cease to conduct any business activities thereafter.

      (a)      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Partners**

For U.S. federal income tax purposes, TreeSap will recognize gain or loss on the Sale Transaction equal to the difference between purchase price paid for the assets and its adjusted tax basis in such assets. Because TreeSap is treated as a partnership for U.S. federal income tax purposes, such gain or loss will be allocated to our partners.

In connection with the implementation of the Plan, TreeSap also expects to recognize cancellation of debt ("COD") income for U.S. federal income tax purposes. COD income is generally the amount by which the indebtedness that is discharged exceeds any consideration given in exchange therefor.

Because TreeSap is a partnership for U.S. federal income tax purposes, such COD income and any other income recognized by it upon implementation of the Plan will be allocated to our partners. Certain statutory and judicial exceptions potentially can apply to limit the amount of COD income required to be included in income by the partners, depending on the partners' circumstances. In particular, exceptions are available that would allow COD income to be excluded from gross income if the COD income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy. These exceptions apply at the "partner" level and thus depend on whether the partner (to whom the COD income is allocated) is itself insolvent or in bankruptcy. The fact that TreeSap or any of the Operating Companies are insolvent and in bankruptcy is not relevant for this purpose. For purposes of determining a partner's insolvency (measured immediately prior to the Effective Date), the partner would be treated as if it were individually liable for any amount of partnership debt equal to the allocated amount of COD income. To the extent any amount of COD income is excludable by a partner by reason of the insolvency or bankruptcy exception, the partner generally would be required to reduce certain tax attributes (such as net operating losses, tax credits, possibly tax basis in assets and passive losses) after the determination of its tax liability for the taxable year.

As discussed in the preceding paragraphs, TreeSap currently expects to recognize loss with respect to the transfer of its assets which will be allocated to its partners. TreeSap also expects to recognize COD income that will be allocable to its unitholders. The amount and character of gain or loss allocable to any particular partner, however, depends, among other factors, on the amount originally paid for the interest and the extent to which the partner has previously been allocated deductions with respect to the transferred assets.

**EACH PARTNER IS URGED TO CONSULT ITS TAX ADVISORS REGARDING THE TAX CHARACTERIZATION OF ANY GAIN OR LOSS REALIZED BY TREESAP ON THE TRANSFER OF ITS ASSETS PURSUANT TO THE SALE TRANSACTION OR ANY OTHER SALE OF ITS ASSETS, AS PART OF THE PLAN AND THE IMPACT OF**

ANY ALLOCATION OF COD INCOME TO A PARTNER.

A partner's adjusted tax basis in his partnership interest will be increased to the extent of any income or gain allocated to such partner and decreased (but not below zero) to the extent of any loss or deduction allocated to such partner, whether or not such loss is disallowed and thus not deductible.

To the extent a partner was allocated losses in taxable years ending prior to the Effective Date, such losses may have been suspended by reason of certain provisions of the Tax Code (in particular those relating to basis limitations, so-called "passive activity losses," or the "at risk" rules). As a result of this transaction, all or part of such losses may become deductible.

For U.S. federal income tax purposes, the discharge of our indebtedness pursuant to the Plan will result in a deemed cash distribution to each partner based on the amount of indebtedness allocable to such partner. A partner's adjusted tax basis in its partnership interest will be decreased (but not below zero) to the extent of any such deemed cash distribution. To the extent that any such deemed cash distribution exceeds the partner's adjusted tax basis in its partnership interest (after adjustment for income, gain or loss allocable to such partner as described above), such partner will recognize gain. Such gain is generally capital gain except to the extent attributable to certain items like inventory items and depreciation recapture. Capital gain generally should be long-term if the partner's holding period for its partnership interest is more than one-year.

TreeSap will not recognize any gain or loss when it ultimately dissolves and liquidates for tax purposes. Each partner who has tax basis in his partnership interest after application of the rules stated above will recognize a loss with respect to the cancellation of its equity interest in TreeSap. The character of such loss is expected to be capital and should be long-term if the partner's holding period in its partnership units is more than one year and otherwise should be short-term.

The U.S. federal income tax consequences of the Plan are complex, and may be adverse for partners of TreeSap. Accordingly, all partners are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them (taking into account their personal circumstances), including the potential for allocations of taxable income without the receipt of cash distributions.

          (b)      **Certain U.S. Federal Income Tax Consequences to U.S. Holders of a Claim Other Than as a Partner of TreeSap**

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim (other than as a partner of TreeSap) will depend, among other things, upon the origin of the Holder's Claim, when the Holder's Claim becomes an Allowed Claim, when the Holder receives payment in respect of such Claim, whether the Holder reports income using the accrual or cash method of accounting, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any assets, (other than any consideration attributable to a Claim for accrued but unpaid interest), and (ii) the adjusted basis of the Allowed

Claim exchanged there for (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. The deductibility of capital losses is subject to limitations. Gain attributable to loans acquired at any time other than at original issuance at a market discount will be treated as ordinary income to the extent of accrued market discount, unless an election to include market discount income currently as it accrues was made.

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### B.    Information Reporting and Backup Withholding

The Debtors and the Post-Effective Date Debtors, as applicable, will withhold all amounts required by law to be withheld from payments under the Plan. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. A U.S. Holder may be subject to backup withholding unless (i) the U.S. Holder is a corporation or other exempt recipient or (ii) or such U.S. Holder provides a properly executed IRS Form W-9. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return). In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD**

**CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3 and 4 to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

> **TreeSap Farms, LLC (on behalf of itself and all other Debtors)**
>
> By:  */s/ Bret Jacobs*
> Name:  Bret Jacobs
> Title:  Chief Restructuring Officer

# EXHIBIT A

Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| TREESAP FARMS, LLC, *et al.*, | § | |
| | § | Case No. 25-90017 (ARP) |
| Debtors.[1] | § | |
| | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

**JOINT PLAN OF LIQUIDATION OF**
**TREESAP FARMS, LLC AND ITS AFFILIATED DEBTORS**
<u>**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

Timothy A. ("Tad") Davidson II
Joseph P. Rovira
Catherine A. Rankin
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  713-220-4200
Email:  taddavidson@Hunton.com
        josephrovira@Hunton.com
        crankin@Hunton.com

*Counsel for Debtors and Debtors in Possession*

Dated: May 9, 2025
Houston, Texas

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: TreeSap Farms, LLC (5183); TSH Opco, LLC (4697); TSV Opco, LLC (5418); TSV Reco, LLC (4953); and TreeSap Florida, LLC (5331). The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is TreeSap Farms, LLC, 5151 Mitchelldale St., Suite B-2, Houston, TX 77292-5279.

TABLE OF CONTENTS

Page

ARTICLE I.     RULES OF INTERPRETATION, COMPUTATION OF TIME AND
DEFINED TERMS ........................................................................................ 1

A.    Rules of Interpretation; Computation of Time .................................................. 1
B.    Defined Terms ................................................................................................... 2

ARTICLE II.    ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS,  AND
DIP FACILITY CLAIMS .......................................................................... 13

A.    Administrative Claims ..................................................................................... 13
       1.    General Administrative Claims ............................................................. 13
       2.    Professional Fee Claims ....................................................................... 14
       3.    Statutory Fees ....................................................................................... 14
B.    Priority Tax Claims ......................................................................................... 15
C.    DIP Facility Claims ......................................................................................... 15

ARTICLE III.   CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ...................................................................................... 15

A.    Summary .......................................................................................................... 15
B.    Classification and Treatment of Claims .......................................................... 16
       1.    Class 1 — Other Priority Claims .......................................................... 16
       2.    Class 2 — Other Secured Claims .......................................................... 16
       3.    Class 3 — Prepetition Lenders Secured Claims .................................... 17
       4.    Class 4 — General Unsecured Claims ................................................... 18
       5.    Class 5 — Intercompany Claims ........................................................... 18
       6.    Class 6 — Intercompany Interests ......................................................... 18
       7.    Class 7 — Equity Interests .................................................................... 18
C.    Elimination of Vacant Classes ........................................................................ 19

ARTICLE IV.    ACCEPTANCE OR REJECTION OF THIS PLAN ................................. 19

A.    Acceptance or Rejection of this Plan ............................................................... 19
       1.    Presumed Acceptance of Plan ............................................................... 19
       2.    Voting Classes ...................................................................................... 19
       3.    Deemed Rejection of this Plan .............................................................. 19
B.    Nonconsensual Confirmation .......................................................................... 19
C.    Subordinated Claims ....................................................................................... 20

ARTICLE V.     MEANS FOR IMPLEMENTATION OF THIS PLAN .............................. 20

A.    Transactions Effective as of the Effective Date .............................................. 20
B.    General Settlement of Claims and Interests ..................................................... 21
C.    Intercreditor Agreement .................................................................................. 21

D.     Administrative Consolidation for Voting and Distribution Purposes Only ..... 21
E.     Uses of Cash .................................................................................................... 22
F.     Plan Administrator ........................................................................................... 22
       1.     Appointment .......................................................................................... 22
       2.     Powers and Authority ........................................................................... 22
       3.     Indemnification ..................................................................................... 24
G.     The Plan Administration Assets ....................................................................... 24
H.     Cancellation of Existing Securities and Agreements ....................................... 24
I.     Corporate Action ............................................................................................. 25
J.     Exemption From Transfer Taxes ..................................................................... 25
K.     Directors, Managers, and Officers of the Debtors ........................................... 25
L.     Insurance Policies ............................................................................................ 26
M.     Cooperation Between Plan Administrator and Purchaser ................................ 26

ARTICLE VI.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
                 LEASES ............................................................................................ 27

A.     Rejection of Executory Contracts and Unexpired Leases ................................ 27
B.     Debtors' Preexisting Obligations Under Executory Contracts and
      Unexpired Leases ............................................................................................. 27
C.     Assumption of the D&O Policies .................................................................... 27
D.     Rejection Damages Claims .............................................................................. 28

ARTICLE VII.     PROVISIONS GOVERNING DISTRIBUTIONS ..................................... 28

A.     Timing and Calculation of Amounts to Be Distributed; Entitlement to
      Distributions .................................................................................................... 28
       1.     Timing and Calculation of Amounts to Be Distributed and Date of
           Distributions .......................................................................................... 28
       2.     Entitlement to Distributions .................................................................. 28
B.     Disbursing Agent ............................................................................................. 29
C.     Distributions on Account of Disputed Claims Allowed After the Effective
      Date ................................................................................................................. 29
D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... 29
       1.     Delivery of Distributions in General ..................................................... 29
       2.     Undeliverable Distributions and Unclaimed Property ........................... 29
       3.     Record Date for Distributions ................................................................ 30
       4.     Fractional Distributions ........................................................................ 30
       5.     De Minimis Distributions ...................................................................... 30
E.     Compliance with Tax Requirement; Allocations .............................................. 30
F.     Surrender of Cancelled Instruments or Securities ........................................... 31
G.     Claims Paid or Payable by Third Parties ......................................................... 31
       1.     Claims Paid by Third Parties ................................................................. 31
       2.     Claims Payable to Third Parties ............................................................ 31
       3.     Applicability of Insurance Policies ........................................................ 31
H.     Allocation of Plan Distributions between Principal and Interest ..................... 31

ARTICLE VIII.   PROCEDURES FOR RESOLVING CONTINGENT,
               UNLIQUIDATED, AND DISPUTED CLAIMS ........................................ 32

    A.     Allowance and Disallowance of Claims ................................................ 32
    B.     Prosecution of Objections to Claims ................................................... 32
    C.     Estimation of Claims .......................................................................... 32
    D.     Distributions After Allowance ............................................................ 33
    E.     Disallowance of Certain Claims ......................................................... 33

ARTICLE IX.     CONDITIONS PRECEDENT TO CONFIRMATION AND
               CONSUMMATION OF THIS PLAN ........................................................ 33

    A.     Conditions Precedent to Confirmation ................................................ 33
    B.     Conditions Precedent to the Effective Date ........................................ 34
    C.     Waiver of Conditions ......................................................................... 35
    D.     Effect of Non-Occurrence of Conditions to Confirmation or
           Consummation ................................................................................... 35
    E.     Substantial Consummation ................................................................. 35

ARTICLE X.      RELEASE, EXCULPATION, INJUNCTION AND RELATED
               PROVISIONS ........................................................................................ 35

    A.     General ............................................................................................... 35
    B.     Debtor Release ................................................................................... 36
    C.     Exculpation ........................................................................................ 37
    D.     Permanent Injunction ......................................................................... 37
    E.     Setoffs ............................................................................................... 38
    F.     Preservation of All Causes of Action Not Expressly Settled or Released ........ 38
    G.     Integral Part of Plan ........................................................................... 39

ARTICLE XI.     RETENTION OF JURISDICTION .............................................................. 39

ARTICLE XII.    MISCELLANEOUS PROVISIONS .......................................................... 41

    A.     Reservation of Rights ......................................................................... 41
    B.     No Government Releases ..................................................................... 41
    C.     Payment of Statutory Fees ................................................................. 41
    D.     Statutory Committee .......................................................................... 42
    E.     Modification of Plan .......................................................................... 42
    F.     Revocation or Withdrawal of Plan ..................................................... 42
    G.     Successors and Assigns ...................................................................... 42
    H.     Further Assurances ............................................................................. 43
    I.     Severability ........................................................................................ 43
    J.     Votes Solicited in Good Faith ............................................................ 43
    K.     Service of Documents ........................................................................ 43
    L.     Governing Law .................................................................................. 44
    M.    Pre-Effective Date Tax Reporting and Compliance ........................... 44
    N.     Schedules ........................................................................................... 44

O.       Conflicts ............................................................................................................ 44
P.       Entire Agreement .............................................................................................. 45
Q.       2002 Notice Parties .......................................................................................... 45

# JOINT PLAN OF LIQUIDATION OF
# TREESAP FARMS, LLC AND ITS AFFILIATED DEBTORS
# UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

TreeSap Farms, LLC and certain of its subsidiaries, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), jointly propose the following chapter 11 plan of liquidation (as may be amended, modified or supplemented from time to time in accordance with the terms hereof, this *"Plan"*) for the resolution of the outstanding Claims (as defined below) against and Interests (as defined below) in each of the Debtors.  This Plan is a liquidating plan.  Pursuant to a separate order to be entered by the Bankruptcy Court, the Debtors have sold substantially all of their assets to the Purchaser (defined below).  The Plan provides for the distribution of any proceeds from such sale, as well as the distribution of other cash, the appointment of a plan administrator to, among other things, make distributions in accordance with the terms of this Plan, wind up the Debtors' estates, and administer and liquidate certain property of the Debtors, including the Retained Causes of Action.  The Plan further provides for the substantive consolidation of all of the Debtors solely for the purposes of voting, making distributions on Claims, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, and historical financial information, and for a summary and analysis of this Plan, the treatment of Claims provided for herein and certain related matters.  There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules (each as defined below).  All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

# ARTICLE I.

# RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

## A.     *Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item will be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, or other agreement or document will mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of a Claim or an Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided herein, the rights and obligations arising pursuant to this Plan will be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein will, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) references to "shareholders," "directors," and/or "officers" will also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (m) all references to statutes, regulations, orders, rules of courts, and the like will mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day (as defined below), then such transaction will instead occur on the next succeeding Business Day.

### B.     Defined Terms

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

"*Administrative Claim*" means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2), and 507(b) of the Bankruptcy Code other than the DIP Facility Claims and Professional Fee Claims, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code.

"*Administrative Claims Bar Date*" means the Business Day that is thirty (30) days after the Effective Date which shall be the deadline to file Administrative Claims.

"*Administrative Claims Objection Deadline*" means the Business Day that is twenty-one (21) days after the applicable Administrative Claim is timely filed; *provided* that the Administrative Claims Objection Deadline may be extended pursuant to an order of the Bankruptcy Court or agreement between the Plan Administrator and the respective Holder of the claim.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Allowed*" means, with respect to a Claim or Interest: (i) any Claim or Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the applicable time period fixed by applicable non-bankruptcy law or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order, to the extent such objection is determined in favor of the respective Holder; (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (iii) any Claim or Interest expressly deemed Allowed by this Plan.  A Claim or Interest that is Allowed shall include a Claim or Interest that is Disputed to the extent such Claim or Interest becomes Allowed after the Effective Date.  A Claim that is Allowed shall not, for purposes of Distributions under this Plan, include interest on such Claim accruing from or after the Petition Date.   Any Claim that relates to obligations that were assumed by the Purchaser pursuant to the Asset Purchase Agreement shall not be an Allowed Claim against the Debtors for purposes of this Plan and shall not be entitled to any distribution on account of such Claim.

"*Asset Purchase Agreement*" means the asset purchase agreement by and between the Debtors and the Purchaser, attached to the Sale Order as Exhibit A.

"*Assumed Trade Payable Claims*" means any prepetition or postpetition Claim through the Closing Date held by a claimant that provided goods and services related to the operation of the Debtors' business; *provided*, *that*, such Assumed Trade Payables Claims shall not include any Farm Credit Payables (as defined in the Asset Purchase Agreement).

"*Avoidance Action*" means any avoidance, recovery, subordination claims or causes of action commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code or under applicable law.

"*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

"*Balloting Agent*" means Donlin Recano & Company, LLC in its capacity as notice and balloting agent for the Debtors.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended from time to time, as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

"*Bidding Procedures Order*" means the *Order (I) Approving Bidding Procedures; (II) Authorizing the Debtors to Select Stalking Horse Bidder(s) and Approving Bidding Protections for Such Stalking Horse Bidder(s); (III) Scheduling an Auction and a Sale Hearing; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Assumption and Assignment Procedures for Executory Contracts and Unexpired Leases; and (VI) Granting Related Relief* entered by the Bankruptcy Court on March 19, 2025 [Docket No. 122].

"*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Collateral*" has the meaning set forth in the DIP Order.

"*Causes of Action*" means any action, Claim, Avoidance Action, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, Secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law; *provided* that Causes of Action shall not include any causes of action transferred, sold, or released pursuant to the Sale Order (including, without limitation, Avoidance Actions).

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered and procedurally consolidated chapter 11 cases pending for all of the Debtors in the Bankruptcy Court.

"*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code, against the Debtors or the Estates, whether or not asserted or Allowed.

"*Claims and Noticing Agent*" means Donlin Recano & Company, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

"*Claims Bar Date*" means (i) May 27, 2025 at 5:00 p.m. (prevailing Central Time), which is the general deadline for filing Proofs of Claim for any Claims against the Debtors that arose prior to the Petition Date (other than Claims held by Governmental Units); and (ii) August 25, 2025, which is the deadline for Governmental Units to file Proofs of Claim against the Debtors, in each case as set pursuant to the Claims Bar Date Order.

"*Claims Bar Date Order*" means the *Order (I) Establishing (A) Bar Dates, and (B) Related Procedures for Filing Proofs of Claim; (II) Approving the Form and Manner of Notice Thereof; and (III) Granting Related Relief* entered by the Bankruptcy Court on April 8, 2025 [Docket No. 182].

"*Claims Objection Deadline*" means the date that is ninety (90) days after the Effective Date, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator.

"*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

"*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

"*Closing Date*" has the meaning set forth in the Asset Purchase Agreement.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to that certain *Notice of Appointment of Official Committee of Unsecured Creditors* filed by the U.S. Trustee on March 12, 2025 [Docket No. 82].

"*Committee Professionals*" means (i) McDermott Will & Emery LLP and (ii) Province, LLC.

"*Confirmation*" means the entry of the Confirmation Order confirming the Plan, subject to all conditions specified in Article IX.A hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

"*Confirmation Date*" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan.

"*Confirmation Order*" means the final, non-appealable order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, supplemented, or modified from time to time.

"*Consummation*" means the occurrence of the Effective Date of this Plan.

"*CRO*" means Bret Jacobs of The Keystone Group serving as the Debtors' Chief Restructuring Officer.

"*D&O Insurance Coverage*" means coverage for insureds under any applicable D&O Policies.

"*D&O Policies*" means all insurance policies (including policies providing D&O Insurance Coverage and D&O Tail Coverage (such policies, "*D&O Tail Policies*")) and related agreements of indemnity for directors', members', trustees' and officers' liability issued or providing coverage at any time to any of the Debtors or their Representatives and all agreements, documents or instruments relating thereto, for any policy period whatsoever.

"*D&O Tail Coverage*" means the extension of the D&O Insurance Coverage, that may be purchased either prior to or following the Effective Date, for any period beyond the end of the applicable policy period, including but not limited to any extension for a period of six (6) years after the Effective Date for claims based on conduct occurring prior to the Effective Date.

"*Debtor Release*" has the meaning set forth in Article X.B herein.

"*DIP Credit Agreement*" has the meaning set forth in the DIP Order.

"*DIP Facility Claim*" means any Claim held by any DIP Secured Party derived from or based upon the DIP Credit Agreement or the DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, indemnification, and other charges arising under or related to the DIP Credit Agreement.

"*DIP Lender*" has the meaning set forth in the DIP Order.

"*DIP Loan Documents*" has the meaning set forth in the DIP Order.

"*DIP Motion*" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* [Docket No. 16].

"*DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Senior Secured Priming Liens; (III) Granting Adequate Protection to the Prepetition Lenders; (IV) Modifying the Automatic Stay;*

*and (V) Granting Related Relief* entered by the Bankruptcy Court on March 26, 2025 [Docket No. 150].

"*Disallowed*" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or Plan Administrator in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim or a proof of Interest, as applicable, has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of Claim or proof of Interest; and (vi) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Bankruptcy Court.  In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

"*Disbursing Agent*" means the Person chosen by the Debtors or the Plan Administrator to make or facilitate Distributions pursuant to this Plan.  The Plan Administrator may serve as the Disbursing Agent.

"*Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Liquidation for TreeSap Farms, LLC and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, dated May 9, 2025, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto.

"*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for soliciting and tabulating votes on the Plan.

"*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest to which the Debtors or any other party in interest has filed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or that is otherwise disputed by the Debtors in accordance with applicable law.

"*Distribution*" means a distribution made or facilitated by the Disbursing Agent pursuant to this Plan.

"*Distribution Date*" means a date or dates, including the Initial Distribution Date, on which the Disbursing Agent makes a Distribution to Holders of Allowed Claims.

"*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims are eligible to receive Distributions under this Plan, which date shall be two (2) Business Days prior to the Effective Date.

"*Effective Date*" means the first Business Day on which all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.C hereof.

"*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

"*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"*Exculpated Parties*" means collectively: (a) the Debtors; (b) the Independent Director; and (c) the Committee and each of the members of the Committee.

"*Exculpation*" means the exculpation provision set forth in Article X.C hereof.

"*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Equity Interests*" means, collectively, (a) any equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity) in any Debtor, and (b) any other rights or agreements, including arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, other than Intercompany Interests.

"*Final Order*" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

"*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors that is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Priority Tax Claim; (d) an Other Secured Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) a Prepetition Lender's Secured Claim; (h) an Intercompany Claim; or (i) an Assumed Trade Payable Claim paid pursuant to the Asset Purchase Agreement.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*GUC Recovery Pool Escrow Account*" means a segregated interest-bearing account to be established by the Debtors into which the GUC Recovery Pool shall be deposited on or prior to the Effective Date.

"*GUC Recovery Pool*" means Cash equal to $100,000, which Cash shall be held, subject to Article VIII hereof, in the GUC Recovery Pool Escrow Account, and shall solely be available to fund recoveries to Holders of General Unsecured Claims. The GUC Recovery Pool shall not include or contemplate amounts paid on account of Assumed Trade Payable Claims pursuant to the Asset Purchase Agreement.

"*Holder*" means any Person or Entity that is the owner of record of a Claim or an Interest, as applicable.

"*Impaired*" means, with respect to a Claim or Interest, or Class of Claims or Interests, a Claim or Class that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Independent Director*" means John T. Young, Jr. of Neinda Advisors, LLC.

"*Initial Distribution*" means the first Distribution that the Disbursing Agent makes to Holders of Allowed Claims.

"*Initial Distribution Date*" means the date selected by the Debtors on or as soon as reasonably practicable after the Effective Date on which the Initial Distribution occurs.

"*Insurance Policies*" means all insurance policies and related agreements issued or providing coverage at any time to any of the Debtors or any of their predecessors and all agreements, documents, or instruments relating thereto, including any D&O Policies.

"*Insurer*" means any non-Debtor company or other Entity that issued or entered into an Insurance Policy (including any third party administrator) and any respective predecessors and/or affiliates thereof.

"*Intercompany Claim*" means a Claim against any Debtor by an Affiliate of such Debtor, which Affiliate may be another Debtor.

"*Intercompany Interest*" means, collectively, any equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity) held by one Debtor in any other Debtor.

"*Intercreditor Agreement*" means that certain Intercreditor and Subordination Agreement, dated as of September 29, 2017, between the Prepetition Lenders and HCR Moorpark, as described further in the DIP Motion.

"*Interests*" means, collectively, Equity Interests and Intercompany Interests.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Other Priority Claim*" means any Claim against any of the Debtors entitled to priority in payment as specified in section 507(a)(4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"*Other Secured Claim*" means any Secured Claim against any of the Debtors other than a DIP Facility Claim.  Any Claim of HCR's (as defined in the DIP Order) shall be a Class 4 General Unsecured Claim, as described further in the Disclosure Statement.

"*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means February 24, 2025.

"*Plan Administration Agreement*" means the agreement to be entered into by and among the Debtors and the Plan Administrator with respect to the Plan Administration Process, which shall be included in the Plan Supplement.

"*Plan Administration Assets*" has the meaning set forth in Article V.G of this Plan.

"*Plan Administration Expenses*" means all reasonable and documented fees, expenses (including any undisputed expenses incurred by professionals retained by the Plan Administrator), and costs incurred by the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement in accordance with the Post-Effective Date Budget, which shall be funded as part of the Wind-Down Amount in accordance with the terms of this Plan.

"*Plan Administration Indemnified Parties*" has the meaning set forth in Article V.F.3 of this Plan.

"*Plan Administration Process*" means the process for resolving and paying Claims described in Article VIII of this Plan.

"*Plan Administrator*" means an individual selected by the Debtors, in consultation with counsel to the DIP Lender and Prepetition Lenders, and disclosed in the Plan Supplement.

"*Plan Schedule*" means a schedule annexed to this Plan or an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, supplemented, or modified from time to time.  The Exhibits and Plan Schedules (or substantially final forms thereof) will be filed with the Bankruptcy Court at least seven (7) days prior to the deadline to object to Confirmation.

"*Post-Effective Date Budget*" means the budget setting forth, among other things, the (a) estimated aggregate amounts of Administrative Claims, Other Priority Claims, Priority Tax Claims, and Other Secured Claims, to be paid under this Plan; and (b) Wind-Down Amount.  The

Post-Effective Date Budget shall be funded from Retained Cash and shall be in a form mutually agreeable to the Debtors and the Prepetition Agent.

"*Post-Effective Date Debtors*" means the Debtors after the Effective Date.

"*Post-Effective Date TreeSap*" means TreeSap Farms, LLC after the Effective Date.

"*Prepetition Agent*" means Capital Farm Credit, ACA.

"*Prepetition Lenders*" means Capital Farm Credit, ACA, for itself and/or as agent/nominee for any party pursuant to a master agreement among it and its wholly-owned subsidiaries, Capital Farm Credit, FLCA and Capital Farm Credit, PCA, as their interests may appear.

"*Prepetition Lenders Deficiency Claim*" means all Claims of the Prepetition Lenders and the Prepetition Agent arising from, under or in connection with the Prepetition Loan Agreement and all documents related thereto that remain after payment of the Prepetition Lenders Secured Claims.

"*Prepetition Lenders Secured Claim*" means the Secured Claims of the Prepetition Lenders and the Prepetition Agent arising from, under or in connection with the Prepetition Loan Agreement and all documents related thereto.

"*Prepetition Loan Agreement*" has the meaning set forth in the DIP Order.

"*Priority Tax Claim*" means any Secured or Unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"*Pro Rata Share*" means, with respect to any Distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

"*Professional Fee Claim*" means a Claim for professional services, including legal, financial, investment banking, advisory, accounting, and other services rendered or costs incurred by Professional Persons on or after the Petition Date through the Effective Date.

"*Professional Fee Escrow Account*" means a segregated interest-bearing account established by the Debtors into which the Professional Fee Escrow Amount shall be deposited on or prior to the Effective Date.

"*Professional Fee Escrow Amount*" means the aggregate unpaid amount of Professional Fee Claims incurred or estimated in good faith to be incurred in connection with the Chapter 11 Cases prior to and as of the Effective Date and held in the Professional Fee Escrow Account.

"*Professional Persons*" means any Person or Entity retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

10

"*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

"*Purchaser*" means TYFCO, LLC and any successor thereto that carries on the business of the Debtors after the Effective Date.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by the Plan in accordance with section 1124(1) of the Bankruptcy Code.

"*Released Parties*" means collectively: (a) each Debtor and Post-Effective Date Debtor; (b) the Independent Director; (c) the CRO; (d) the DIP Lender; (e) the Prepetition Agent; (f) the Prepetition Lenders; (g) the Plan Administrator; (h) the Committee and its members; (i) the Professional Persons; and (j) with respect to each of the foregoing Persons and Entities in clauses (a) through (i), each Person's or Entity's Representatives.

"*Representatives*" means, with respect to an Entity or Person, such Entity's or Person's current and former (i) officers, (ii) directors, (iii) managers, (iv) principals, (v) members, (vi) employees, (vii) agents, (viii) advisory board members, (ix) financial advisors, (x) Affiliates, (xi) partners, (xii) attorneys, (xiii) accountants, (xiv) trustees, (xv) investment bankers, (xvi) consultants, (xvii) representatives, and (xviii) other professionals and advisors, each in their capacity as such.

"*Retained Cash*" means all of the Debtors' Cash, including any sale proceeds following Consummation of the Sale Transaction, existing as of the Effective Date.

"*Retained Causes of Action*" means all Causes of Action owned by the Debtors' Estates that are not released, waived, or transferred pursuant to this Plan or the Sale Order and listed on the Schedule of Retained Causes of Action.

"*Sale Order*" means that certain *Order (I) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (II) Authorizing the Sale of the Acquired Assets Free and Clear of any Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing the Assumption and Assignment of the Assumed Contracts, and (IV) Granting Related Relief* entered on [May 12], 2025 [Docket No. ____], by the Bankruptcy Court.

"*Sale Transaction*" means the sale of substantially all of the Debtors' assets to Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

"*Sale Transaction Documents*" means the Asset Purchase Agreement and related documents pursuant to which the Debtors will effectuate the Sale Transaction.

"*Schedule of Retained Causes of Action*" means the schedule of Retained Causes of Action included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

"*Schedules*" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

"*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

"*Secured Claim*" means a Claim that is Secured.

"*Solicitation*" means the solicitation of votes on this Plan.

"*Solicitation Procedures*" means the procedures concerning Solicitation established pursuant to a motion of the Debtors for an order, *inter alia*, (a) approving the adequacy of the Disclosure Statement, (b) approving the Solicitation and voting procedures with respect to this Plan, (c) approving the forms of ballots and notices in connection with this Plan, (d) scheduling certain dates with respect to the Solicitation and approval of this Plan, and (e) granting related relief, to be filed by the Debtors.

"*Statutory Fees*" means all fees and charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

"*TreeSap*" means Debtor TreeSap Farms, LLC.

"*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Claim, or Class of Claims, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

"*Voting Class*" means Classes 3 and 4.

"*Voting Deadline*" means [June 27, 2025, at 4:00 p.m.] (Prevailing Central Time).

"*Voting Record Date*" means [May 27], 2025.

"*Wind-Down*" means the process of winding down the Debtors' businesses and Estates, objecting to and reconciling Claims, making distributions and winding down and dissolving the

Debtor-entities and all actions related to, necessary for, or otherwise appropriate to effectuate the foregoing.

"*Wind-Down Amount*" means Cash equal to an aggregate amount sufficient to fund the (i) Professional Fee Escrow Amount; (ii) GUC Recovery Pool; and (iii) Plan Administration Expenses.

"*Wind-Down Account*" means a segregated account to be established by the Debtors or Plan Administrator into which the Wind-Down Amount, *less* the Professional Fee Escrow Amount, shall be deposited on or prior to the Effective Date.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

### A.   *Administrative Claims*

1.   General Administrative Claims

Except (a) with respect to Administrative Claims that are Professional Fee Claims or Statutory Fees, or (b) to the extent that a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash by the Disbursing Agent on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable.  Any Allowed Administrative Expense Claim that has been expressly assumed by the Purchaser as an Assumed Trade Payable Claim under the Sale Transaction Documents shall receive no Distribution under the Plan on account of such Claim and shall be paid by the Purchaser in accordance with the Sale Transaction Documents.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously filed or paid, requests for payment of Administrative Claims must be filed and served on the Debtors or Plan Administrator no later than the Administrative Claims Bar Date; *provided*, that the foregoing shall not apply to the U.S. Trustee as a Holder of a Statutory Fee. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors and their respective Estates.  All such Claims shall be subject to the permanent injunction set forth in Article X.D hereof.  Nothing in this Article II.A shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to requests for payment of Administrative Claims must be filed and served on the Debtors or Plan Administrator, as applicable, and the requesting party by the Administrative Claims Objection Deadline.

2.  Professional Fee Claims

All Professional Persons seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full by the Disbursing Agent from the Professional Fee Escrow Account or Retained Cash in such amounts as are Allowed by the Bankruptcy Court on the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator. As set forth in this Plan, any undisputed fees and expenses incurred post-Effective Date by professionals retained by the Plan Administrator shall be considered Plan Administration Expenses and paid in the ordinary course without the need for Bankruptcy Court approval.

On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Escrow Amount. Funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Plan Administrator but the Post-Effective Date Debtors shall have a reversionary interest in any unused portion of the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been irrevocably paid in full. On and after the Effective Date, the Professional Fee Escrow Account shall be held by the Plan Administrator on behalf of the Post-Effective Date Debtors for Professional Persons and for no other parties until all Allowed Professional Fee Claims have been paid in full. The Post-Effective Date Debtors' obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account as of the Effective Date. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account in any way, other than customary liens in favor of the depository bank at which the Professional Fee Escrow Account is maintained.

Objections to any final requests for payment of Professional Fee Claims must be filed no later than twenty-one (21) days from the date of the filing of such final requests for payment of Professional Fee Claims. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.

3.  Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Disbursing Agent shall pay any and all such fees when due and payable from the Wind-Down Account in accordance with this Plan. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of Statutory Fees.

### B.     Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, either be (1) paid in full in Cash by the Disbursing Agent on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable in accordance with non-bankruptcy law or (2) paid in Cash by the Disbursing Agent in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. Any Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documents shall receive no Distribution under the Plan on account of such Claim, not be an obligation of the Debtors and shall be paid by the Purchaser in accordance with the Sale Transaction Documents.

### C.     DIP Facility Claims

The DIP Facility Claims shall be deemed Allowed under this Plan.

All Allowed DIP Facility Claims not otherwise already paid at closing of the Sale Transaction shall be paid in Cash by the Disbursing Agent on the Effective Date or as soon thereafter as reasonably practicable in the discretion of the Plan Administrator. Upon the foregoing satisfaction of all Allowed DIP Facility Claims, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility shall be of no further force or effect. For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

### A.     Summary

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions, if any, pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of this Plan for that Debtor.

The Debtors shall be substantively consolidated solely for the purposes of voting, making Distributions on Claims, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions.

**<u>Summary of Classification and Treatment of Claims</u>**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3. | Prepetition Lenders Secured Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Impaired | Entitled to Vote |
| 5. | Intercompany Claims | Impaired | Deemed to Reject |
| 6. | Intercompany Interests | Impaired | Deemed to Reject |
| 7. | Equity Interests | Impaired | Deemed to Reject |

**B.**     ***Classification and Treatment of Claims***

1.     <u>Class 1 — Other Priority Claims</u>

    (a)     *Classification*: Class 1 consists of all Other Priority Claims.

    (b)     *Treatment*:  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim and the Plan Administrator agree to less favorable treatment, in full satisfaction and release of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash by the Disbursing Agent.

    (c)     *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.     <u>Class 2 — Other Secured Claims</u>

    (a)     *Classification*:  Class 2 consists of all Other Secured Claims.

    (b)     *Treatment*:  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim and the Plan Administrator agree to less favorable treatment, in full satisfaction and release of each Allowed Other Secured Claim, each Allowed Other Secured Claim shall, at the option of the Plan Administrator (i) be paid in full in Cash by the Disbursing Agent in an amount equal to the value of the collateral securing such Allowed Other Secured Claim,

(ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such claim unimpaired.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.     <u>Class 3 — Prepetition Lenders Secured Claims</u>

(a)     *Classification*:  Class 3 consists of Prepetition Lenders Secured Claims.

(b)     *Treatment*: The Prepetition Lenders Secured Claim is deemed Allowed in the aggregate principal amount plus accrued and unpaid interest of not less than $[161,000,000] on account of the Prepetition Obligations (as defined in the DIP Order), plus fees, expenses (including advisors' and professionals' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities, and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law. Except to the extent that a Holder of an Allowed Prepetition Lenders Secured Claim agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Prepetition Lenders Secured Claim, the Prepetition Agent, on behalf of each Holder of an Allowed Prepetition Lenders Secured Claim, shall, on or as soon as reasonably practicable after the Effective Date and in the discretion of the Plan Administrator, receive from the Disbursing Agent the Retained Cash that remains after (i) full satisfaction of the Allowed DIP Facility Claims, and (ii) the amounts and Claims covered by the Post-Effective Date Budget are paid or an appropriate reserve is established in the discretion of the Plan Administrator.  The Prepetition Agent shall then pay each Holder of an Allowed Prepetition Lenders Secured Claim their allocable share of the Retained Cash.

The Prepetition Lenders Deficiency Claim shall be in amount equal to the Allowed amount of the Prepetition Lenders Secured Claim less any payments received on account of the Prepetition Lenders Secured Claim, shall be treated as a Class 4 General Unsecured Claim, and shall be entitled to vote and receive distributions as the holder of a Class 4 General Unsecured Claim in accordance with the Plan.

(c)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of Prepetition Lenders Secured Claims are entitled to vote on the Plan and shall receive Ballots.

4.  Class 4 — General Unsecured Claims

    (a)  *Classification*:  Class 4 consists of all General Unsecured Claims, including without limitation, the Prepetition Lenders Deficiency Claim.

    (b)  *Treatment*:  On the Effective Date, each General Unsecured Claim shall be discharged and released, and each Holder of an Allowed General Unsecured Claim shall be entitled to receive from the Disbursing Agent its Pro Rata Share of (i) the GUC Recovery Pool, and (ii) proceeds (if any) realized from the Plan Administrator's pursuit of the Retained Causes of Action.

    (c)  *Voting*:  Class 4 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote on the Plan and shall receive Ballots.

5.  Class 5 — Intercompany Claims

    (a)  *Classification*:  Class 5 consists of all Intercompany Claims.

    (b)  *Treatment*:  On the Effective Date, each Intercompany Claim shall be cancelled, released and extinguished, and each holder of an Intercompany Claim shall not receive or retain any Distribution, property, or other value on account of its Intercompany Claim.

    (c)  *Voting*:  Class 5 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.  Class 6 — Intercompany Interests

    (a)  *Classification*:  Class 6 consists of all Intercompany Interests.

    (b)  *Treatment*:  On the Effective Date, each Intercompany Interest shall be cancelled, released and extinguished, and each holder of an Intercompany Interest shall not receive or retain any Distribution, property, or other value on account of its Intercompany Interest.

    (c)  *Voting*:  Class 6 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.  Class 7 — Equity Interests

    (a)  *Classification*:  Class 7 consists of all Equity Interests.

    (b)  *Treatment*:  On the Effective Date, all Equity Interests shall be cancelled, released and extinguished, and each holder of an Existing Equity Interest shall not receive or retain any Distribution, property, or other value on account of its Equity Interest.

(c)     *Voting*:  Class 7 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Exiting Equity Interests are not entitled to vote to accept or reject the Plan.

### C.     Elimination of Vacant Classes

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### ARTICLE IV.

### ACCEPTANCE OR REJECTION OF THIS PLAN

### A.     Acceptance or Rejection of this Plan

1.     Presumed Acceptance of Plan

Claims in Classes 1 and 2 are Unimpaired under this Plan and, therefore, Holders of such Claims are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

2.     Voting Classes

Claims in Classes 3 and 4 are Impaired under this Plan, and the Holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject this Plan.

3.     Deemed Rejection of This Plan

Claims and Interests in Classes 5, 6, and 7 are Impaired under this Plan and Holders of such Claims or Interests shall receive no Distributions under this Plan on account of their Claims or Interests (as applicable) and are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 5, 6, and 7 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

### B.     Nonconsensual Confirmation

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### C.      Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective Distributions (if any) and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Plan Administrator reserves the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THIS PLAN

### A.      Transactions Effective as of the Effective Date

The transactions contemplated by this Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their officers or directors, or any other Person or Entity.

On or before the Effective Date, each of the Debtors shall assign and transfer any and all of their respective remaining assets, including the Retained Causes of Action, to Post-Effective Date TreeSap such that on the Effective Date:

i.      all such assets of the Debtors shall vest (or revest, as applicable) and be owned by Post-Effective Date TreeSap and shall be considered Plan Administration Assets;

ii.      all Claims and Causes of Action are considered to be held against Post-Effective Date TreeSap;

iii.      any right to object to any Claims or Causes of Action shall be the right of Post-Effective Date TreeSap and the Plan Administrator; and

iv.      all Retained Causes of Action shall be held by Post-Effective Date TreeSap and pursued by the Plan Administrator on behalf of Post-Effective Date TreeSap.

As of the Effective Date, all property of Post-Effective Date TreeSap shall be free and clear of all Claims, encumbrances, Equity Interests, charges, and Liens except as provided or contemplated in the Plan or as provided in the Confirmation Order.

On the Effective Date, all of the corporate organizational documents of the Debtors shall be deemed amended without further action by any party to (i) appoint the Plan Administrator and vest the Plan Administrator with all authority and power to oversee the Wind-Down of the affairs of the Debtors and Post-Effective Date Debtors; and (ii) eliminate any voting or other governance rights of any member or manager in the Debtors and Post-Effective Date Debtors, as applicable.

**B.**     *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  Such settlement and compromise shall not include or affect any Causes of Action listed in the Schedule of Retained Causes of Action.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VII hereof, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**C.**     *Intercreditor Agreement*

Except as expressly provided in the Plan, all rights, entitlements, and distributions shall be subject to the Intercreditor Agreement, the priorities and payment waterfalls of which shall be incorporated, preserved, and enforced by the Plan, the Debtors, the Plan Administrator and, as applicable, the Post-Effective Date Debtors, pursuant to section 510 of the Bankruptcy Code.

**D.**     *Administrative Consolidation for Voting and Distribution Purposes Only*

The Plan is premised upon the substantive consolidation of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, the resulting treatment of all Claims and Interests and making Plan Distributions. Each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims and Interests under the Plan. On the Effective Date, and except as otherwise expressly provided in the Plan, solely for voting, confirmation, and distribution purposes with respect to each Class of Claims or Interests: (a) all Claims in each respective Class shall be deemed merged or consolidated and treated as Claims against the Debtors on a consolidated basis; (b) each Claim in each respective Class will be deemed a single Claim against Post-Effective Date TreeSap; (c) any Claim in a given Class based on a guaranty by any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished, so that any Claim against any Debtor and any guarantee thereof by any other Debtor, and any joint or several liability of any of the Debtors, shall be deemed to be one obligation of Post-Effective Date TreeSap; and (d) each Holder of any Allowed Claim or Interest in a given Class shall be entitled to a single recovery on account of such Claim or Interest, in accordance with the treatment provided under the Plan for such Class, regardless of whether such Holder filed Proofs

of Claim against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt.

### E.    Uses of Cash

On or prior to the Effective Date, the Retained Cash shall be placed into accounts established and maintained by the Debtors, including, as applicable, the GUC Recovery Pool Escrow Account, the Professional Fee Escrow Account, and the Wind-Down Account.  On the Effective Date, all Retained Cash, including the Wind-Down Account and the GUC Recovery Pool Escrow Account, but not the Professional Fee Escrow Account, shall vest in the Post-Effective Date TreeSap and its Estate pursuant to Article V.G of this Plan.

The Post-Effective Date Budget shall be funded from Retained Cash in order to ensure the payment in full of all Administrative Claims, Other Secured Claims, Other Priority Claims, Priority Tax Claims, the GUC Recovery Pool, the Wind-Down Amount, and Professional Fee Escrow Amount.  The remaining amount of Retained Cash shall be paid to Holders of Allowed Prepetition Lenders Secured Claims in accordance with the treatment of Class 3 Claims set forth in Article III.B.3 above; *provided*, *however*, that in the event the Wind-Down Amount is insufficient to provide for full payment of the Plan Administration Expenses and Allowed Professional Fee Claims, the Plan Administrator shall use Retained Cash to fund the shortfall.

### F.    Plan Administrator

1.    <u>Appointment</u>  As part of the Wind-Down, the Debtors shall appoint the Plan Administrator to administer all aspects of this Plan other than those specific duties delegated hereunder.

2.    <u>Powers and Authority</u>  On and after the Effective Date, the Plan Administrator shall have the authority and right on behalf of each of the Debtors and Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of this Plan including, without limitation, to:

(a)    control and effectuate the Claims reconciliation process, including the exclusive authority to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(b)    make Distributions to Holders of Allowed Claims in accordance with this Plan, including, without limitation, to establish sufficient reserves necessary to make distributions on account of Claims that may become Allowed after the Effective Date;

(c)    receive, manage, invest, supervise, abandon and protect any and all property of the Post-Effective Date Debtors, including the Plan Administration Assets, consistent with the terms of the Plan, and take all actions necessary to effectuate same;

(d)     exercise reasonable business judgment to direct and control the Wind-Down, liquidation, sale, or abandonment of the remaining assets of the Debtors;

(e)     analyze the Retained Causes of Action and decide whether to abandon, pursue, litigate, or settle such claims;

(f)     prosecute, as a representative of the Debtors' Estates, any Retained Cause of Action;

(g)     authorize payment in full of unpaid Allowed Professional Fee Claims;

(h)     retain and compensate, in the ordinary course and without the requirement of Bankruptcy Court approval, professionals to assist the Plan Administrator in performance of its duties under the Plan;

(i)     facilitate maintenance of the books and records and accounts of the Debtors and obtain any necessary insurance;

(j)     incur and pay all Plan Administration Expenses;

(k)     facilitate administration of the tax-related obligations of each Debtor or its Estate, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(l)     prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(m)     merge or dissolve any Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders;

(n)     facilitate payment of Statutory Fees in accordance with Article II.A.3 of this Plan;

(o)     undertake all administrative functions in the Chapter 11 Cases for the Post-Effective Date Debtors pursuant to the terms of the Plan and Confirmation Order, including the closing of any Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules;

(p)     appear and be heard on behalf of the Post-Effective Date Debtors before any court, tribunal, agency, commission, or other body of any governmental entity;

(q)     perform other duties and functions that are consistent with the implementation of this Plan; and

(r)     exercise such other powers as may be vested in them pursuant to an order of the Bankruptcy Court or pursuant to the Plan, or as they reasonably deem to be necessary and proper to carry out the provisions of the Plan.

3.     <u>Indemnification</u>  The Debtors or Post-Effective Date Debtors, as applicable, shall indemnify and hold harmless, as a Plan Administration Expense, (i) the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement, and (ii) such other Persons retained by the Plan Administrator (collectively, the "<u>Plan Administration Indemnified Parties</u>"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administration Indemnified Party's willful misconduct or gross negligence, with respect to the Debtors or the implementation or administration of the Plan.

## G.     *The Plan Administration Assets*

On the Effective Date, the Plan Administrator shall sign the Plan Administration Agreement and accept (i) the Wind-Down Account, the Professional Fee Escrow Account, the GUC Recovery Pool Escrow Account (in each case including the Cash therein); (ii) the D&O Tail Coverage and any D&O Tail Policies (to the extent purchased prior to the Effective Date); and (iii) any and all of the Debtors' respective assets remaining upon closing of the Sale Transaction, including the Retained Causes of Action, that will be transferred and assigned to Post-Effective Date TreeSap in accordance with Article V.A of this Plan (collectively, the "<u>Plan Administration Assets</u>").  As of the Effective Date, all Plan Administration Assets and all assets dealt with in this Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise further provided in this Plan or in the Confirmation Order.

After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and Plan Administration Expenses, and to the extent that the Plan Administrator determines in good faith and on a reasonable basis, that substantially all of the Claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied in full, the Plan Administrator shall remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to a non-profit charitable organization qualifying under Section 501(c)(3) of the I.R.C.; *provided that* such charity shall be selected by the Plan Administrator in its sole discretion.

## H.     *Cancellation of Existing Securities and Agreements*

On the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any

prepetition Claim or Interest shall be cancelled and of no further force and effect, except that each of the foregoing shall continue in effect solely to the extent necessary to (a) allow Holders of such Claims or Interests to receive Distributions under this Plan; (b) allow the Debtors and the Plan Administrator, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to this Plan on account of such Claims; and (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or Interests pursuant to any such applicable document or instrument.

## I.        *Corporate Action*

Upon the Effective Date all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

## J.        *Exemption From Transfer Taxes and Fees*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer pursuant to, in contemplation of, or in connection with this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or fee, or other similar tax, fee or governmental assessment, and the appropriate state or local government officials, recording officers or agents, wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code and shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

## K.        *Directors, Managers, and Officers of the Debtors*

Following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers, directors and managers of each of the Debtors shall continue in their respective capacities in accordance with the applicable by-laws or other organizational documents, unless otherwise agreed between the Debtors and the Purchaser, and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in this Plan.

On and after the Effective Date, the Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of the Debtors, as applicable, under applicable state law.

## L.    *Insurance Policies*

D&O Tail Coverage shall be purchased, whether pre-Effective Date by the Debtors or post-Effective Date by the Plan Administrator.  To the extent such D&O Tail Coverage is purchased after the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Tail Coverage for the full term of such D&O Policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage and the D&O Policies in all respects. Further, to the extent such D&O Tail Coverage is purchased after the Effective Date, premiums and other costs associated with purchasing and maintaining the D&O Tail Coverage shall constitute Plan Administration Expenses.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, to the extent any Insurance Policies have not already been assumed and assigned to the Purchaser pursuant to the Sale Order or Sale Transaction Documents, (i) on the Effective Date, the Debtors shall be deemed to have assumed all such Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) neither Confirmation nor Consummation of this Plan shall alter, impair or otherwise modify the terms and conditions of any such Insurance Policy or the coverage provided pursuant thereto.

## M.    *Cooperation Between Plan Administrator and Purchaser*

Prior to the completion of the Wind-Down and closing of the Chapter 11 Cases of the Post-Effective Date Debtors, the Plan Administrator shall have reasonable access to, and the reasonable assistance of, the Purchaser, and to the assets, software, and systems of the Debtors, to the extent necessary to (a) reconcile Claims in connection with the Chapter 11 Cases, and (b) with respect to the Plan Administrator, complete the Wind-Down, in each case consistent with the Asset Purchase Agreement and the Plan Administration Agreement.  Prior to the completion of the Wind-Down and closing of the Chapter 11 Cases of the Post-Effective Date Debtors, the Purchaser shall have reasonable access to, and the reasonable assistance of, the Plan Administrator, and to the assets, software, and systems of, as applicable, the Post-Effective Date Debtors, (x) to continue to perform its obligations to holders of Assumed Trade Payable Claims and any other obligations of the Debtors assumed by the Purchaser under this Plan or the Sale Order and (y) as otherwise necessary in the ordinary course of operations.  Further, in accordance with Section 10.6 of the Asset Purchase Agreement, the Post-Effective Date Debtors and the Plan Administrator agree to cooperate with the Purchaser after the Closing Date to enable the Purchaser to move, liquidate and/or otherwise dispose of the Acquired Assets (as defined in the Asset Purchase Agreement) located on or used in association with owned and leased real property which is not part of the Acquired Assets (subject in all respects to the conditions set forth in Section 10.6 of the Asset Purchase Agreement).

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    *Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, as of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale Transaction, and are not the subject of a pending motion or notice to reject, assume, or assume and assign as of the Effective Date, and (2) have not expired under their own terms prior to the Effective Date; *provided*, *however*, that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and their Estates, the Debtors' officers, managers and directors, and the Post-Effective Date Debtors.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### B.    *Debtors' Preexisting Obligations Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

### C.    *Assumption of the D&O Policies*

The Debtors and the Post-Effective Date Debtors, as applicable, shall assume all of the D&O Policies pursuant to section 365(a) of the Bankruptcy Code that have not been assumed pursuant to the Sale Transaction.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Policies and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secured for the insureds the benefits of the D&O Policies.

In addition, after the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under a D&O Tail Policy covering the Debtors' current boards of directors in effect on or after the Petition Date and, subject to the terms of the applicable D&O Tail Policy, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

**D.**     *Rejection Damages Claims*

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under this Plan (including, without limitation, Claims that assert any indemnification right pursuant to corporate governance documents of the Debtors' that have been rejected) must be filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Article VI.A above, and the deadline for filing any rejection damages Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court shall be the applicable deadline under such order or the Claims Bar Date Order, as applicable.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim shall be classified and treated as a Class 4 General Unsecured Claim.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions*

1.     Timing and Calculation of Amounts to Be Distributed and Date of Distributions

On the Initial Distribution Date, each Holder of an Allowed Claim against the Debtors shall receive the amount of the Distribution that this Plan provides for Allowed Claims in the applicable Class.  Subsequent Distributions shall be made, if determined by the Plan Administrator to be practicable and appropriate; *provided* that the Plan Administrator may refrain from making a Distribution to the extent the Plan Administrator reasonably determines that the costs of making such Distribution are not reasonable in comparison to the amount of such Distribution and instead may reserve making any subsequent Distributions until a future Distribution date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII and Article VIII.

2.     Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date.  Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date.

**B.     Disbursing Agent**

Except as otherwise provided herein, all Distributions under this Plan shall be made by the Debtors or the Post-Effective Date Debtors as Disbursing Agent or such other Entity designated by the Plan Administrator as a Disbursing Agent on the Effective Date.

**C.     Distributions on Account of Disputed Claims Allowed After the Effective Date**

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Disbursing Agent, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

**D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.     Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holder's address on its Proof of Claim, if applicable, (b) such Holder's address listed on a notice filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' Schedules.

2.     Undeliverable Distributions and Unclaimed Property

(a)     Failure to Claim Undeliverable Distributions

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.  Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the Distribution was returned.  After such date, such unclaimed Distribution shall revert to the Post-Effective Date Debtors and their Estates (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Holder of such Claim shall receive no Distribution from the Debtors on account of such Claim.

(b)     Failure to Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim for which such check was originally issued.  After such date, such unclaimed Distribution shall revert to the Post-Effective Date Debtors and their Estates (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws

to the contrary), and the Holder of such Claim shall receive no Distribution from the Debtors on account of such claim.  Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

        3.      <u>Record Date for Distributions</u>

For purposes of making Distributions on the Initial Distribution Date only, the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business on the Distribution Record Date.

        4.      <u>Fractional Distributions</u>

Notwithstanding anything in this Plan to the contrary, no payment of fractional cents shall be made pursuant to this Plan.  Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

        5.      <u>De Minimis Distributions</u>

Notwithstanding anything to the contrary contained in this Plan, the Disbursing Agent shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $50 shall receive no Distribution from the Post-Effective Date Debtors on account of such claim and be forever barred from asserting such Claim against the Estates.

**E.**      ***Compliance with Tax Requirement; Allocations***

In connection with this Plan and all Distributions hereunder, the Disbursing Agent shall take any and all actions that may be necessary or appropriate to comply with all applicable withholding and reporting requirements imposed on them.  Notwithstanding any provision in this Plan to the contrary, all Persons and Entities holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of applicable taxes (or establish eligibility for an exclusion for the withholding of taxes), and each Holder of an Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations associated therewith, including income, withholding, and other tax obligations.  Any amounts withheld or reallocated pursuant to this Section E shall be treated as if distributed to the Holder of the Allowed Claim.  The Disbursing Agent reserves the right to allocate all Distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Debtors, the Plan Administrator, or the Disbursing Agent may require, as a condition to the receipt of a Distribution, that a Holder furnish to the Debtors, Plan Administrator, or Disbursing Agent, as applicable, any necessary or appropriate tax documentation and information, including a Form W-8 or Form W-9.  If any Holder fails to comply with such a request within one

(1) month thereof, such Distribution in respect of such Holder may be withheld and deemed an undeliverable Distribution and shall be treated in accordance with Article VII.D.2 hereof.

### F.   Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any Distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

### G.   Claims Paid or Payable by Third Parties

#### 1.   Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed upon an order of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Plan Administrator including, without limitation, the Purchaser.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administrator to the extent the Holder's total recovery on account of such Claim exceeds the total Allowed amount of such Claim as of the Distribution Date.

#### 2.   Claims Payable to Third Parties

No Distributions under this Plan shall be made on account of a Claim that is payable pursuant to one of the Insurance Policies until the Holder of such Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon satisfaction by such Insurer(s), such Claim may be expunged to the extent of such satisfaction upon an order or approval of the Bankruptcy Court.

#### 3.   Applicability of Insurance Policies

Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver (i) of any Cause of Action that the Debtors or any Entity may hold against any Insurers under any Insurance Policies, or (ii) by such Insurers of any rights or defenses held by such Insurers.

### H.   Allocation of Plan Distributions between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall, except as required by law (as reasonably determined by the Debtors or the Plan Administrator), be allocated first to the principal amount of the Claim and then, to the extent the

consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A.     *Allowance and Disallowance of Claims*

No Claim shall be deemed Allowed unless and until such Claim is Allowed under the Bankruptcy Code, this Plan or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim.  The Plan Administrator after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim.

Any Claim filed after the applicable Claims Bar Date is automatically deemed Disallowed unless such Holder of the Claim obtains Bankruptcy Court approval to file a late claim.

### B.     *Prosecution of Objections to Claims*

The Plan Administrator shall have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims.  From and after the Effective Date, the Plan Administrator, may settle or compromise any Disputed Claim, and may administer and adjust the Claims Register to reflect such settlements or compromises, without notice to, action, order, or approval of the Bankruptcy Court.  The Plan Administrator may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary.

With respect to the foregoing rights of the Plan Administrator to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege.  The Plan Administrator shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

### C.     *Estimation of Claims*

The Plan Administrator may request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator has previously objected to such Claim.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning an objection to a Claim. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.

### D.        *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim as a Claim other than a Subordinated Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

### E.        *Disallowance of Certain Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Post-Effective Date Debtors.

**ARTICLE IX.**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THIS PLAN**

### A.        *Conditions Precedent to Confirmation*

Unless satisfied or waived pursuant to the provisions of Article IX.C hereof, the following are conditions precedent to Confirmation of this Plan:

1.  The Disclosure Statement Order shall have been entered by the Bankruptcy Court on a final basis.

2.  The Confirmation Order shall have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Sale Order and otherwise be in form and substance reasonably acceptable to the Debtors, and shall not have been vacated, amended or otherwise modified.

3.  The Sale Order shall constitute a Final Order and shall not have been vacated, amended or otherwise modified.

4.  The Sale Transaction Documents shall not have been terminated in accordance with their terms.

**B.**     *Conditions Precedent to the Effective Date*

In addition to the satisfaction of the provisions of Article IX.A hereof, unless satisfied or waived pursuant to the provisions of Article IX.C hereof, the following are conditions precedent to the occurrence of the Effective Date of this Plan:

1.  The Confirmation Order shall have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Sale Order and otherwise be in form and substance reasonably acceptable to the Debtors, and shall not have been vacated, amended or otherwise modified.

2.  This Plan and all other documents contemplated thereby, including any amendments, modifications, or supplements thereto, shall be consistent in all material respects with the Sale Order and otherwise be in form and substance reasonably acceptable to the Debtors.

3.  All conditions precedent to the effectiveness of the Sale Transaction Documents shall have been satisfied or waived pursuant to the terms thereof, and the consummation of such Sale Transaction will have occurred prior to the Effective Date.

4.  The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate this Plan and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by this Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by this Plan.

5.  The Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement shall otherwise be in form and substance reasonably acceptable to the Debtors.

6.  All actions, documents, certificates, and agreements necessary to implement this Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

7.  The Wind-Down Account shall have been established and funded in an amount consistent with the Post-Effective Date Budget.

8.  The GUC Recovery Pool Escrow Account shall have been established and funded with the GUC Recovery Pool.

9.  The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount.

10.  All Statutory Fees due and payable prior to the Effective Date shall have been paid by the Debtors.

11. All Allowed DIP Facility Claims shall be repaid and satisfied in full by the sale proceeds received by the Debtors upon closing of the Sale Transaction.

## C.      *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may, with the consent of the Committee, be waived by the Debtors with or without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

## D.      *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## E.      *Substantial Consummation*

On the Effective Date, this Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## ARTICLE X.

## RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS

## A.      *General*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall collectively constitute an integrated and global good faith compromise or settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, any Distribution to be made on account of such Allowed Claim or Allowed Interest, including, without limitation, all controversies among the Debtors, the Committee, and all other Holders of Claims against the Debtors.  The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan and the good faith compromise and settlement of all of the Claims, Interests and controversies (other than Causes of Action specifically retained by the Debtors' estates) described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  The provisions of this Plan, including, without limitation, the global settlement of all Claims, Interests and controversies and the release, injunction, exculpation and compromise provisions provided herein,

are mutually dependent.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of all of the provisions of this Plan collectively as an integrated and global compromise and settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such integrated compromises and settlements are in the best interests of the Debtors, their Estates and Holders of Claims and Interests and are fair, equitable and reasonable.  In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other Entities.

**B.**     *Debtor Release*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by this Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "<u>Debtor Released Claims</u>"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, the DIP Order and the DIP Loan Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission; <u>provided</u>, <u>however</u>, that the foregoing "<u>Debtor Release</u>" shall not operate to waive or release, and the "Debtor Released Claims" shall not include, any Cause of Action of any Debtor or its Estate: (1) against a Released Party arising from any obligations owed to the Debtors pursuant to an Executory Contract or Unexpired Lease that is not otherwise rejected by the Debtors**

**pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2) expressly set forth in and preserved by this Plan or related documents; (3) that is of a commercial nature and arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (4) against a Holder of a Disputed Claim to the extent necessary to administer and resolve such Disputed Claim solely in accordance with this Plan; or (5) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, willful misconduct or criminal conduct (other than with respect to or relating to the Adversary Actions).  Notwithstanding anything to the contrary in the foregoing, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement executed in connection with this Plan with respect to the Debtors, the Post-Effective Date Debtors, or the Estates.**

### C.     *Exculpation*

**To the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article X of this Plan, effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of this Plan, making Distributions, implementing the Wind-Down, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Sale Order, or the solicitation of votes for, or Confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions in furtherance of any of the foregoing; _provided_, _however_, that none of the foregoing provisions shall operate to waive or release (i) any Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under this Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on this Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan.  The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### D.     *Permanent Injunction*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released

pursuant to this Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Post-Effective Date Debtors, or the Exculpated Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article X hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Post-Effective Date Debtor, or Exculpated Party, as applicable.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Post-Effective Date Debtor, Exculpated Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  Any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.**

### E.      Setoffs

Except as otherwise expressly provided for in this Plan, each Debtor and the Plan Administrator, pursuant to the Bankruptcy Code or applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may setoff against any Claim and the Distributions to be made pursuant to this Plan on account of such Claim (before any Distribution is made on account of such Claim), any Claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Debtor of any such Claims, rights and Causes of Action that such Debtor may possess against such Holder.

### F.      Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Retained Causes of Action not transferred to the Purchaser as part of the Sale Transaction or released hereunder for later adjudication by, as applicable, the Debtors or the Plan Administrator (including, without limitation, Retained Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe

to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan, or the Confirmation Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article X.B, and the Exculpation contained in Article X.C hereof) or any other Final Order (including, without limitation, the Sale Order or the Confirmation Order).  In addition, the Debtors and the Plan Administrator, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Retained Causes of Action against them.

### G.     Integral Part of Plan

Each of the provisions set forth in this Plan with respect to the settlement, release, cancellation, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action is an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the Sale Order, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest, including equitable subordination or other subordination of any Claim or Interest pursuant to 11 U.S.C. § 510;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

3.  resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

4.  resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

6.  ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes related thereto;

7.  decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

8.  enforce all orders previously entered by the Bankruptcy Court;

9.  enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

10. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person or Entity's obligations incurred in connection with this Plan;

11. hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

12. hear and determine disputes arising in connection with the interpretation, implementation, enforcement of the Sale Order, Asset Purchase Agreement, or other document(s) governing or relating to the Sale Transaction including, without limitation, and all matters arising in connection with the Sale Transaction;

13. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

14. enforce the terms and conditions of this Plan and the Confirmation Order, and maintain the integrity of this Plan following Consummation;

15. hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

16. resolve any cases, controversies, suits or disputes with respect to the Release, Exculpation, indemnification and other provisions contained in Article X hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such provisions;

17. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

18. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan;

19. enter an order or orders concluding or closing the Chapter 11 Cases;

20. hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    *Reservation of Rights*

Except as expressly set forth herein, this Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan will be or will be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or other Entity; or (2) any Holder of a Claim or an Interest or other Entity prior to the Effective Date.

### B.    *No Government Releases*

Except as expressly provided for in this Plan, nothing herein, or in the Confirmation Order or other related Plan documents shall affect a release or limit any claim arising solely under the enforcement of the police powers or regulatory activities of the United States Government or any of its agencies, or any state and local authority, whatsoever.

### C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

**D.     *Statutory Committee***

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

**E.     *Modification of Plan***

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in accordance with section 1127(a) of the Bankruptcy Code and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify this Plan in accordance with section 1127(b) of the Bankruptcy Code.  A Holder of a Claim that has accepted this Plan will be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**F.     *Revocation or Withdrawal of Plan***

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan will be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

**G.     *Successors and Assigns***

This Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.  Further Assurances

The Debtors, all Holders of Claims receiving Distributions hereunder, and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

### I.  Severability

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### J.  Votes Solicited in Good Faith

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125 of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, each of the Released Parties and Exculpated Parties and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, none of such parties or individuals or the Post-Effective Date Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the securities offered and sold under this Plan or any previous plan.

### K.  Service of Documents

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail or courier, and addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| TreeSap Farms, LLC<br>5151 Mitchelldale St., Ste. B-2<br>Houston, TX 77292-5279<br>Attn: Bret C. Jacobs<br>(bjacobs@thekeystonegroup.com) | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Attn: Timothy A. ("Tad") Davidson II<br>(taddavidson@hunton.com), Joseph P. Rovira |

43

|  | (jrovira@hunton.com), and Catherine A. Rankin (crankin@hunton.com) |
|---|---|
| **United States Trustee** | **Counsel to the Creditors' Committee** |
| Office of The United States Trustee 515 Rusk Street, Suite 3516 Houston, Texas 77002 Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov) | McDermott Will & Emery LLP 2501 North Harwood Street, Suite 1900 Dallas, Texas 75201 Attn: Charles R. Gibbs (crgibbs@mwe.com) and Marcus Helt (mhelt@mwe.com) |
| **Counsel to the DIP Lender and The Prepetition Agent** |  |
| Porter Hedges LLP 1000 Main Street, 36th Floor Houston, TX 77002 Attn: Eric M. English (eenglish@porterhedges.com), M. Shane Johnson (sjohnson@porterhedges.com), and James A. Keefe (jkeefe@porterhedges.com) |  |

## L.      Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Definitive Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the laws of the state of Texas, without giving effect to the principles of conflicts of law of such jurisdiction.

## M.      Pre-Effective Date Tax Reporting and Compliance

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

## N.      Schedules

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

## O.      Conflicts

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order or the Sale Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts

with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control; *provided* that, in the event of any conflict with any provision of this Plan and/or the Confirmation Order, the Confirmation Order shall govern; *provided further* that, in the event of any conflict between the Plan, on the one hand, and the Sale Order, on the other hand, with respect to the Sale Transaction, the Sale Order shall govern.

**P.    *Entire Agreement***

Except as otherwise provided herein or therein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**Q.    *2002 Notice Parties***

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

Respectfully submitted, as of the date first set forth above,

Dated:  May 9, 2025

**TREESAP FARMS, LLC**
on behalf of itself and the other Debtor Entities


*/s/ Bret Jacobs*
Bret Jacobs
Chief Restructuring Officer

**EXHIBIT B**

Liquidation Analysis

(to be filed)